## Moses and others *against* Murgatroyd and others.

Property held in *trust*, does not pass to the representatives of the trustee; but as long as it can be traced and distinguished, it enures to the benefit of the *cestuy que trust*.

Where a *trust* is created for the benefit of a person, without his knowledge at the time, he may, afterwards, affirm the trust, and enforce its performance. Collateral securities to creditors are considered as *trusts* for the better protection of their debts, and equity will see that their intention be fulfilled.

Where an assignment is, on the face of it, *general*, yet if it be admitted to be different in its purpose, or for a specific security, *parol* evidence is admissible to show the real intent of the parties.

The administrator of a mortgagor is not *as such*, entitled to the surplus money arising from the sale of the mortgaged premises; but it is considered as part of the real estate, and goes to the heirs, and will be *assets* in their hands, And where the heirs were before the court, by their parent, it was ordered to be distributed, as *equitable assets*, among all the creditors, *pari passu.*

But as the creditor has a remedy at law against an equity of redemption, it is questionable whether, *before a sale* of the mortgaged premises, it could be deemed equitable assets.

*Assets* may be partly legal, and partly equitable, and the court will discriminate in the distribution of them: following the rule of law, as to the *legal assets*, so as to prevent confusion in the administration of the estate ; but directing the *equitable assets* to be applied rateably among all the creditors, without preference.

THE bill stated, that *Samuel G. Ogden*, on the 16th of *December*, 1805, being indebted to *Isaac Moses & Sons*, plaintiffs, in the sum of 12,412 dollars and 40 cents ; to *Joseph Kauman*, plaintiff, in the sum of 5,891 dollars and 34 cents ; and to *Obed Smith*, also plaintiff, in the sum of 2,523 dollars and 90 cents ; for goods purchased of them, and shipped on board a ship, called the *Emperor*, gave to the plaintiffs, *Moses & Sons*, four promissory notes, payable in six months, to *Samuel Murgatroyd*, and endorsed by him ; to *Kauman*, three notes, endorsed also by *Murgatroyd*, payable in six, seven, and eight months ; and to *Smith*, one note, endorsed by *Murgatroyd*, for the amount of their respective debts.

1814.

MOSES
v.
MURGATROYD.

To imdemnify *Murgatroyd*, and, also, *Governeur &*
*Kemble*, for advances and responsibilities, *Ogden*, about the
same time, by deed, assigned to them so much of the coffee,
arising from a debt due to *Ogden* from the government of
*Hayti*, as should be laden on board of the ship *Emperor*,
belonging to *Ogden*, and which was expected to arrive at
*New-York* from *St. Domingo*. As a special security to
*Murgatroyd*, against his endorsements of the notes, *Ogden*,
on the 12th of *February*, 1806, executed to *Murgatroyd*
another deed of assignment of 100,000 pounds of coffee, or
other goods of the value of 20,000 dollars, on board of the
*Emperor*, parcel of the return cargo, the proceeds of the
outward cargo to *Hayti*.

Before either of the notes became due, *Ogden* became
insolvent, and notice of the non-payment of the notes was
given to *Murgatroyd*, the endorser, who assured the holders
that the notes should be paid out of the property so assigned
to him by *Ogden*, as soon as the ship arrived; and relying
on this assurance, the holders forbore to commence suits on
the notes. In *July*, 1806, the ship arrived at *New-York*
with a valuable cargo of coffee and other goods. On the 3d
of *August*, 1806, *Murgatroyd* died intestate, and the defend-
ant, *Thomas Murgatroyd*, administered on his estate. *Og-
den* having assigned parts of the cargo to other creditors, it
was agreed among all the parties concerned, and by *Thomas
Murgatroyd*, the administrator of *Murgatroyd*, deceased,
to submit the rights of the respective claimants to arbitration.
On the hearing before the arbitrators, *Thomas Murgatroyd*,
the administrator, claimed to be entitled to the benefit of the
security, intended by the assignments from *Ogden*, to the
amount of the notes which he was holden to pay by reason of
the endorsements of the intestate. On the 2d of *October*,
1806, the arbitrators made an award, directing the distribu-
tion of the cargo among all the claimants, who acquiesced in
the award, and received their proportions. The sum re-
ceived by *Thomas Murgatroyd*, the administrator, amount-

ed, besides charges, to 19,000 dollars. While the arbitration was pending, the plaintiffs made repeated applications to *Thomas Murgatroyd,* for payment of the notes, and were always referred by him to the issue of the arbitration, when the notes should be paid ; and, after the award, he promised to pay the notes out of his proportion of the cargo, as soon as it was sold. One of the notes, to *Moses & Son,* was paid by the administrator, and one of the notes, to *Kauman,* was paid by the intestate, in his lifetime, but the other notes remain unpaid.

After the award, the administrator sold part of the cargo, but refused to pay the plaintiffs, alleging, that the intestate had incured other responsibilities for *Ogden* which ought first to be secured.

The widow of *S. M.,* the intestate, afterwards intermarried with *G. Storm ;* and *T. M.,* the administrator, confessed a judgment to her, as executrix of *S. Stevenson,* for 57,766 dollars and 13 cents, and pleaded that judgment, and a deficiency of assets, in bar of the demands of the plaintiffs.

The plaintiffs alleged that this judgment was confessed, and kept on foot, *per fraudem ;* or, if it was not, still it ought not to be paid, as Mrs. *Storm* was not a creditor of *Ogden,* or, if she was, she had no *lien* on the property.

By an agreement between the plaintiffs and defendants, the property received by the administrator, under the assignments of *Ogden,* and remaining in his hands unappropriated, amounting to 11,500 dollars, was placed in the hands of *C. Wilkes,* in trust, subject to the final order and decree of the court in this cause.

The intestate, *S. M.,* died seised of real estate of considerable value at *Harlaem,* which came to the possession of his heirs ; and which was under mortgage to one *Lawrence,* who filed a bill in *May,* 1807, to foreclose, and the property was afterwards sold by a master for 7,500 dollars, but no deed given. The administrator had applied, in *April,* to the surrogate, on the ground of a deficiency of personal assets, and obtain-

1814.

MOSES

v.

MURGATROYD.

ed an order, on the 12th of *June*, 1807, for the sale of the real estate of the intestate, and the proceeds to be brought into the hands of the surrogate, to be distributed according to law ; but the surrogate suspended the proceeding on the order, and consented to the order of sale by the master, with a view to secure the surplus moneys arising from the mortgaged premises. The bill of the plaintiffs called for an account, &c. and that the moneys arising from the sale of the cargo might be applied to the payment of the notes, and not to the payment of the intestate's debts generally ; and that the surplus proceeds of the mortgaged premises might be distributed equally, without a preference of the judgment.

*T. Murgatroyd*, in his answer, admitted that the notes were given and endorsed, and the protest and notice to the endorsee ; that the first assignment, by *Ogden*, of the 20th of *December*, 1805, was a quantity of coffee, particularly designated, but denied that it was made specifically to secure the endorsements, or notes, but was intended as a security against all the engagements by *S. M.* for *Ogden ;* that the second assignment, of the 12th of *February*, 1806, did not relate to any specific liabilty, but was a general security, like the other, for all advances and responsibilities on account of *Ogden ;* that the only specific security given by *Ogden*, was of the *freight* of the ship, which was assigned on the 4th of *May*, 1806, and when the ship arrived, *Ogden* himself received the freight, and became insolvent, so that none of it came to the hands of *S. M.*, or of the administrator. He denied that the intestate ever admitted that the assignments were specifically to secure the endorsements, or that he promised to pay the notes out of the proceeds. He admitted that *Ogden* made other assignments of goods expected in the ship *Emperor*, to other creditors ; that the arbitrators awarded as alleged by the plaintiffs ; that he exhibited the three assignments to the arbitrators, and claimed, under them, to be allowed for all the responsibilities and pay-

ments of the intestate for *Ogden*, amounting to 31,276 dollars and 50 cents, including the endorsements, a note of 5,000 dollars, and a check of 5,000 dollars ; but he denied that he made any claim on account of the notes, more than for any other *item*. He admitted that all parties acquiesced in the award, and that he received under it, out of the assignment, 16,270 dollars and 55 cents ; but denied that he had promised to pay the notes out of the proceeds. He admitted the payment of one of the notes to *Moses*, which had been negotiated to *J. R. Livingston*, but said that it was paid in expectation of receiving the *freight*, and not under the idea that the notes had any preference on the cargo. That he had refused to pay the notes out of the money he had received, because he had other demands against *Ogden*, to wit, a note dated the 14th of *January*, 1806, for 5,000 dollars, for advances made to him by the intestate, and a check of *Ogden*, dated the 10th of *April*, 1806, for 5,000 dollars, which was unpaid ; to satisfy which demands, he insisted he had a right first to apply the proceeds, and also to reimburse himself the sum paid to *J. R. L.* for the note, and also the amount of the note to *Kauman ;* that the intestate, as administrator, with the will annexed, of *Susannah Stevenson*, appropriated to his own use the sum of 57,766 dollars and 13 cents, and for that balance the defendant confessed the judgment to *Susan Storm*, &c. the devisee under the will of Mrs. *Stevenson*, which was entered up the 22d of *December*, 1806 ; which judgment was *bona fide*, and had been pleaded by him, as stated in the bill ; and he denied that it was fraudulent, or done under the indemnification of any person whatever ; and he insisted that he was bound by law, to consider all the proceeds in his hands as *assets*, to be applied, in the course of administration, according to the general rules of law ; and that he was, therefore, bound to apply all the property of the intestate, in his hands, in satisfaction of that judgment.

The defendant admitted, that the amount of the property in the hands of *C. Wilkes* was 11,150 dollars and 50 cents.

1814.

MOSES
v.
MURGATROYD.

the whole of which he claimed as *assets.* The defendant admitted the existence of the mortgage stated in the bill, and the suit and sale, but said that the sale had been since vacated, but for what reason he did not know.

*Garret Storm,* and *Susan,* his wife, (formerly *Susan Murgatroyd,* widow of the intestate,) *Charles Wilkes,* and *William Lawrence,* put in their joint and several answers, in which the principal facts, as stated in the answer of *T. Murgatroyd,* were admitted.

*Samuel G. Ogden,* the assignor, who was examined as a witness, stated, that all the notes given to the plaintiffs were for goods purchased of them, and shipped in the *Emperor,* on the voyage to *Hayti;* that before *Samuel Murgatroyd,* the intestate, consented to endorse the notes, the witness promised to secure him, by the assignments; and that he made the assignment of the 12th of *February,* 1806, for the purpose of securing *S. M.* against *the said endorsements;* and that, as *S. M.* afterwards expressed fears as to the sufficiency of the security, the witness, in *May* following, assigned to him the freight; that the assignment made by him, on the 16th of *December,* 1805, had no reference to the notes, but was intended as a general security; that the note of 5,000 dollars, and the check for the like sum, were not included in the security provided by the assignments of the 12th of *February,* and of *May,* 1806, but were intended to be secured by the one in *December* preceding; that "he always considered that *S. M.* understood, and was impressed, that the assignments of the 12th of *February* and 14th of *May,* 1806, were made specifically to secure the said endorsements, and no other notes."

*J. G. Bogart,* another witness, deposed, that he applied to *T. M.,* the administrator, to pay one of the notes, and he promised to pay it out of the proceeds of the cotton and coffee, which, he understood from *T. M.,* were assigned to *S. M.,* the intestate, to secure him against the said endorsements.

*J. Wilkes*, the notary, who demanded payment of the notes from *S. M.*, testified that the intestate told him, that they would be paid on the arrival of the ship, which had been assigned tò him by *Ogden*, as security for his endorsements. *D. A. Ogden* also deposed, that he understood from *S. M.*, about the time the notes became due, that he had received from *Samuel G. Ogden*, as collateral security for the payment of the notes and of all responsibilities of the same nature, an assignment of property ; that *T. M.*, the administrator, admitted to him, that the assignment of the 12th of *February*, 1806, was made to secure the payment of the notes, for which he, *S. M.*, had become liable for *S. G. Ogden;* and the impression of the witness was, that *T. M.* said he should apply the proceeds of the coffee to the payment of the notes, to secure which the assignment was made.

*Harison* and *Hoffman*, for the plaintiffs, contended, that the evidence fully established the fact that the assignment of the 12th of *February*, 1806, though absolute on the face of it, was given and intended only as a security for the notes due to the plaintiffs ; that it was a settled principle that a specific fund, assigned to pay a debt, should be always so applied; and as long as the fund could be traced, the *trust* must follow, and attach to it. (1 *Equity Cas. Ab.* 93. *K. pl.* 5. *Bac. Ab. Obligation*, (B.) 168. *Kip* v. *Bank of New-York*, 10 *Johns. Rep.* 63.)

Where a deed is, on the face of it, contrary to the *intent* of the parties, it is, *prima facie*, fraudulent, and parol evidence is, therefore, admissible to show the *intent ;* and it was admitted, on all hands, that the assignment, though general, was intended as a specific security.

In *Neilson* v. *Blight*, (1 *Johns. Cas.* 205.,) it was decided that where a trust was created for the benefit of a person, though without his knowledge at the time, he might affirm the trust, and enforce its execution. There could be

1814.

MOSES
v.
MURGATROYD.

no doubt as to the equity of the case; and it was equally clear, that the surplus moneys in the hands of the adminis- trator, arising out of the sale of the real estate, were *equi- table assets.* An executor, though entitled to the surplus of the personal estate, cannot take the proceeds of the real estate. An equity of redemption is equitable assets; and on the principle that equality is equity, a court of equity will always endeavour to make equitable assets, by disre- garding all preferences among the creditors. (3 *Bac. Ab.* 58. 1 *Salk.* 79. s. 1.) This court, then, ought to lay hold of the fund, and distribute it rateably among all the cre- ditors.

*Wells* and *Colden*, contra, contended, that the plaintiffs had no equity, in preference to the infant children of the in- testate. The principal object of the plaintiffs, in coming into this court, was to set aside the judgment, on the allega- tion of fraud; but that allegation had been fully disproved, and the judgment shown to be *bona fide.*

The plaintiffs seek to alter the legal distribution of the *assets* in the hands of the administrator, and, on some pretext of equity, to gain a preference over the judgment creditor, and against the infant children of the intestate. The ad- ministrator had a right to confess the judgment, and thereby give a preference; but the plaintiffs insist that there are certain liens and trusts which ought to change the legal des- tination of the property. The credit was given to the per- sonal responsibility of the intestate, as endorser, and to *Samuel G. Ogden*, as maker of the notes. The plaintiffs did not look further, and further they ought not to be allowed to go. The intestate was to be indemnified, for lending his name and money to *Ogden*, by the assignments. Third persons, not privies to an assignment made for the benefit of *S. M.*, and now claimed for his children, ought not to take that benefit.

The note and check, which are to be refunded, will nearly absorb all the money the administrator has received; and this court can distribute only the surplus that may remain, after deducting what had been advanced by the intestate.

The assignments of the 20th of *December*, and 12th of *February*, are both general; but that of the 14th of *May* is a specific security. The answer expressly denies that the assignment of the 12th of *February* was specific. Can *parol* evidence be admitted to contradict, or alter the operation of that assignment? Parol trusts are void by the statute; and to permit parol evidence, in this case, would be against the policy of the statute, and of dangerous consequence. The answer denies all the allegations on which the plaintiffs rest their claim to the interposition of this court. The evidence, in a great degree, confirms the answer, that the assignments of *December* and *February* were *general*, and intended to cover all the responsibilities of the intestate for *Ogden*. The assignment of the freight, in *May*, being intended to be *specific*, was so expressed.

Where a general assignment is given by way of security, and without any specific destination, it may be applied by the assignee to any debt or demand due to him, at his election or discretion.

Again, there is no colour of equity for considering the surplus money in this court, on the sale of the mortgaged premises, as equitable assets. This court will not consider itself as ancillary to the surrogate; and because, by chance, the money has come into this court, decree according to the rules of the surrogate's court. The proceedings before him were abandoned, and the surplus ought then to be distributed according to the rules of law.

The Chancellor. The plaintiffs found their claim to the proceeds of the cargo, assigned by *Ogden* to *S. Murgatroyd*, on the 12th of *February*, 1806, as being property held by the intestate, in trust, for the payment of their notes.

If this be once conceded or ascertained, as a matter of fact, the conclusion follows, of course, that the proceeds were not assets in the hands of *Thomas Murgatroyd*, the adminis- trator, for the general creditors of his intestate, but they exist- ed in his hands subject to the trust. The cases of *Deering* v. *Torrington*, (1 *Salk.* 79. pl. 1.,) and of *Kip* v. *The Bank of New-York*, (10 *Johns. Rep.* 63.,) show that pro- perty held in trust does not pass to the representatives of the trustee discharged of the trust, but, if it can be traced and distinguished, it shall enure to the benefit of the *cestuy que trust*.

The assignment to *Samuel Murgatroyd* was absolute on the face of it; but it is admitted by the answer of the ad- ministrator, and supported by all the proof in the cause, that the assignment was made, and taken by him, as a se- curity or indemnity merely; this fact being admitted, the party interested has a right to go into parol proof to explain the extent and object of the security. The admission of parol proof, to show the intent, becomes indispensable. The defendant, (the administrator,) in his answer, admits the as- signment to be different from what it purports to be. It does not, therefore, truly express the intent of the parties; and parol evidence is, then, clearly admissible to show that intent. The deed was false on the face of it, by the admission in the answer, but that admission does not go to impeach the general fairness of the transaction; the difference between the deed as expressed, and the deed as intended, may have arisen from mistake, or ignorance, or accident; and it becomes necessary, in order to attain justice, that the court should let in parol proof to discover, and carry into effect the real intention of the parties in creating the security.

I have no doubt, then, of the competency of the parol proof in this case; and the weight of that proof goes to establish the fact for which the plaintiffs contend, that the assignment was made to indemnify *S. Murgatroyd* against the endorsement of the notes in question. This appears

from the evidence of *Ogden*, who made the assignment, and who testifies that he made it for that specific purpose, and for no other, and that he always considered that *S. Murgatroyd*, the assignee, so understood it. This appears, also, from the testimony of *J. G. Bogart*, and of *D. A. Ogden*, who state, that they understood the same from the administrator, *Thomas Murgatroyd;* and it further appears, from the evidence of *Wilkes*, that when he demanded payment of the notes of the intestate, he admitted, in respect to the ship, an assignment to him, by *Ogden*, as security for his endorsements. We have, then, a very full and explicit admission of the fact from all the parties concerned ; from *Ogden*, who made the assignment ; from *Samuel Murgatroyd*, the assignee ; and from *Thomas Murgatroyd*, his administrator, and one of the defendants.

I shall then consider this fact as well made out, viz. that the assignment of the 12th of *February*, 1806, though absolute on the face of it, was intended, by the parties to it, to be a security only to the intestate for his endorsement of the notes in question. This being the case, the plaintiffs, as holders of the notes, are entitled to the benefit of this collateral security, given by their principal debtor to his surety ; and the case of *Maure* v. *Harrison*, (1 *Eq. Ab.* 93. *K.* 5. *Mich.* 1692.,) is directly to this point. These collateral securities are, in fact, trusts created for the better protection of the debt ; and it is the duty of this court to see that they fulfil the design. And whether the plaintiffs were apprized, at the time, of the creation of this security, is not material. The trust was created for their benefit, or for the better security of their debt, and when it came to their knowledge, they were entitled to affirm the trust, and to enforce its performance. This was the principle assumed in the case of *Neilson* v. *Blight*, (1 *Johns. Cas.* 205.)

The plaintiffs are, accordingly, entitled to the exclusive appropriation of the 11,150 dollars and 50 cents, in the

1814.

MOSES
v.
MURGATROYD,

hands of *Charles Wilkes*, with the interest thereon, towards the payment of their notes.

The next question is, whether the surplus moneys now in this court, and arising on the sale of the lands mortgaged to *Lawrence*, shall go to the administrator for distribution, where they will be absorbed by the judgment confessed, or whether they shall be distributed under the direction of this court, *pro rata*, among all the creditors, as equitable assets. The administrator is not, as such, entitled to this surplus ; it is part of the *real* estate, and goes to the heirs, and would be assets in their hands. The heirs appear to be infants, and their mother, *Susan Storm*, is before the court in the character of a creditor, in behalf of her children, and holding a judgment confessed by the administrator. I am inclined to consider the moneys in question as equitable assets. It was held, in *Plunket* v. *Penson*, (2 *Atk.* 290.,) that the equity of redemption of a mortgage, in fee, forfeited in the lifetime of the mortgagor, was equitable and not legal assets ; and the same doctrine was held by the Master of the Rolls, in the case of *Sir Charles Cox's creditors*, (3 *P. Wms.* 341.) But as the creditor has a remedy at law, with us, against an equity of redemption, it might be doubted whether it could be deemed equitable assets while unsold ; but after it is converted into money, under the decree of this court, I think the money is to be treated as equitable assets ; for the creditor must come here for relief, as the money is placed under the jurisdiction of the court. In *Freenoult* v. *Dedire*, (1 *P. Wms.* 429.,) it was said, that where the estate descends to the heir, it is legal assets, but if the heir sell the land before suit, it then becomes equitable assets. The general doctrine is to encourage, as much as possible, the idea of equitable assets, because equality in the payment of debts is equity, and the rule of distribution, in chancery, is founded on principles of natural justice. Assets may be partly legal and partly equitable, and the court will, in such case, discriminate, and direct that such as

are legal, be applied in a course of administration, and such as are equitable, be applied *pari passu.* This was done in *North* v. *Cox,* (3 *P. Wms.* 344. n. 3.) In the distribution of legal assets, this court follows the rule of law, to prevent confusion in the administration of the estate; but whenever the assets are considered as equitable, then it is well and uniformly settled, that they are to be distributed among all the creditors, *pro rata,* without giving preference. *Morris* v. *Bank of England,* (2 *Cas. temp. T.* 218.)

I conclude, then, that the surplus moneys now in court are to be treated and distributed as equitable assets; and as no objection was made to the want of proper parties before the court, the decree must be entered accordingly;

1. That the plaintiffs are entitled to the 11,150 dollars and 50 cents, in the hands of Mr. *Wilkes;* and,

2. That the surplus moneys, arising upon the sale of the mortgaged premises, ought to be distributed as equitable assets, rateably among all the creditors.