THE STATE *Ex Rel.* THE ATTORNEY GENERAL, PLAINTIFF IN ERROR, *vs.* THE PRESIDENT AND DIRECTORS OF THE BANK OF THE STATE OF SOUTH CAROLINA, DEFENDANTS IN ERROR.

So much of the Act "to close the operations of the Bank of the State of South Carolina," passed September 15, 1868, as authorizes and requires the Governor, "for and on behalf of the State, to take possession of all the real and personal estate, assets, choses in action and books of account of" the Bank of the State of South Carolina, and sell the same, at public auction, "upon such terms as he shall deem most advantageous to the State," and deposit the proceeds in the Treasury, subject to his order, is void, because within the inhibition of the Constitution of the United States, that "no State shall pass any law impairing the obligation of contracts."

Though the capital of the Bank of the State of South Carolina was furnished by the State, and its profits enured to the benefit of the State, and the faith of the State was pledged to its support, yet it was a distinct corporation, having the ordinary powers and rights, and subject to the ordinary obligations, of banking corporations, with liability to suits by its creditors, and holding its property subject to their claims in preference to the claims of the State as its only stockholder.

A creditor has the right to be subrogated to all the rights of the surety or guarantor of his principal debtor, in securities taken by the surety, or guarantor, for his own indemnity or protection—*semble.*

State *vs.* The Bank of the State of South Carolina.

An Act so changing existing remedies as materially to impair the rights and interests of creditors, is within the inhibition of the Constitution of the United States in reference to laws "impairing the obligation of contracts."

An Act withdrawing the property of a debtor from the operation of all legal process by his creditors, leaving to them the barren right to sue, virtually destroys the remedy of a creditor, and impairs the obligation of his contract.

BEFORE WILLARD, A. J., AT CHAMBERS, CHARLESTON, OCT., 1868.

This was an information by the Attorney General, praying that a rule do issue, to be served upon the President and Directors of the Bank of the State of South Carolina, the respondents, requiring them to shew cause why a *mandamus* should not be awarded, commanding them to deliver to His Excellency the Governor of the State all the real and personal estate, assets, choses in action and books of account of the corporation known as the President and Directors of the Bank of the State of South Carolina, as required by the Act passed September 15, 1868, entitled "An Act to close the operations of the Bank of the State of South Carolina"

A rule was accordingly issued and served on the respondents, who made a return thereto, setting forth various grounds as causes why a *mandamus* should not issue against them. One of the grounds was, that the Act aforesaid is in violation of Article 1, Section 10, Par. 1, of the Constitution of the United States, which declares that "no State shall pass any law impairing the obligation of contracts."

His Honor, Mr. Associate Justice Willard, discharged the rule, and filed his reasons therefor, as follows:

WILLARD, A. J. The Attorney General has, in behalf of the State, filed a suggestion, praying that a writ of *mandamus* do issue to the respondents, commanding them to deliver to the Governor the assets of the Bank of the State, in accordance with the provisions of the Act of the Legislature entitled "An Act to close the operations of the Bank of the State of South Carolina," passed September 15th, 1868. A rule to show cause has been granted, upon the return of which the respondents now appear to show cause for the discharge of the rule.

The first objection of the respondents is to the sufficiency of suggestion to warrant the issuing of the writ. Respondents contend that they stand before the Court as private citizens, and not as pub-

lic officers, and that, for that reason, they are not amenable to the writ. They also contend that the subject-matter of the controversy is one to which the writ is inapplicable.

The writ presupposes a duty to be performed in which the public are concerned : the respondent must, therefore, be a person capable of performing such a duty. Though commonly issued to public officers, it equally extends to any person, official or otherwise, who may owe a public duty, and, in respect thereof, stands in the relation of a public servant. Chief Justice Marshall says, in *Marbury* vs. *Madison*, 1 Curtis, 384 : " It is not by the office of the person to whom the writ is directed, but by the nature of the thing to be done, that the propriety or impropriety of issuing a *mandamus* is to be determined."

Blackstone (3 Bl. Com., 110) enumerates, among those to whom it issues, " persons." It is not the design of the writ to draw to the Court the official powers of the respondent, so that the Court can perform what he has neglected, but it acts personally upon him, compelling, by personal pains and penalties, the performance of a neglected duty. It is as much a remedy against the person as an indictment and action at law for official misfeasance.

It is unnecessary to consider whether the President and Directors are, in a technical sense, public servants, although one branch of the Legislature so considered them, holding them to be officers " contemplated by the Constitution as vacating the seat of any such member of the Legislature." — Resolution of House of Representatives, September 15, 1813, Bank Compilation, p. 73.

The true question is, whether the act required to be performed is one that may be compelled by *mandamus*.

To establish a claim to the writ, the State must establish, *prima facie*, a clear right to demand the performance of some act, and a corresponding specific duty, on the part of the respondent, to perform the same, imposed by law, (*Marbury* vs. *Madison*, 1 Curtis, 381,) in its nature ministerial, and not depending on the discretion of the respondent, (*Kendall* vs. *United States*, 12 Curtis, 834,) and that the public are, in some degree, directly concerned in the performance of such duty ; also, that performance has been demanded and refused, and that no specific remedy exists for the enforcement thereof.—*King* vs. *Barker*, 3 Burr., 1265.

Section 1 of the Act of September 15, set forth by the suggestion, declares that " the Governor of the State is hereby authorized

and required, for and on behalf of the State, to take possession of all the real and personal estate, assets, choses in action, and books of accounts of the corporation known as the President and Directors of the Bank of the State of South Carolina, in whose hands soever found." It alleges a demand on the part of the Governor, and a refusal of compliance on the part of respondents. It is conceded by the return that there is property, of the description specified in the law, in the hands of the respondents as officers of the bank. The requirements of the statute cannot be complied with, unless such property is delivered to the Governor; and hence it is contended by the Attorney General, that there results, by necessary implication of law, a duty on the part of the respondents to perform such act, of the same obligation as if commanded in express terms. Assuming that the respondents have no personal interest in the required act, but are to be regarded as standing in the relation of public servants to the property claimed, such implication is not only reasonable, but necessary to the attainment of the object of the statute. If the Governor has a clear, legal right to take the property, the withholding it is a wrong, the essence of which, in the case of a public servant, is the failure of official duty. Nor is it of importance that the respondents are not named in the statute as the holders of the property—the language of the Act, "in whose soever hands found," being sufficiently descriptive to denote the persons who ought to comply with its requirements.

It remains, therefore, to inquire whether the respondents are amenable to the law, in the character of public servants.

The Bank of the State was created in 1812, as a corporation and body politic, to continue until 1835, and has been continued under subsequent statutes until the present time. It was established "in the name and in behalf of the State." Its capital was a fund created from the resources of the State, guaranteed against deficiency by a pledge of the faith of the State. It was made a bank of loan, discount, issue and deposit. It could incur obligations, and had the largest powers to deal with property usually conferred upon banking companies. It could sue and be sued, have a corporate seal, make by-laws, "and, generally, to do and execute all and singular such matters and things which to them it should appertain to do." The President and Directors were chosen by the Legislature. The State, from time to time, increased the resources of the bank by deposit subject to its draft, but upon which it was authorized to bank. In addition to this, all public officers holding

public moneys were required to employ the bank as their place of safe-keeping. The unexpended balance remaining in the Treasury of the State at the end of any fiscal year was placed to the credit of the capital of the bank. The profits were, in 1821, created a fund for the redemption of the State six per cent. stocks.

The Legislature, from time to time, passed laws controlling the institution, clearly expressive of a relation more intimate than that which usually subsists between the State and banking corporations.

It is obvious that the bank was created for the use of the State— a purely public purpose—and that the State intended to retain, and did, in fact, retain over the institution the fullest control capable of being exercised over a corporate institution—a power that necessarily resulted from the reservation to the State of all elements of public authority, and those appertaining to the ownership of the stock of such an institution. To the extent of the entire limit of the constitutional authority of the Legislature, the officers of the bank were bound to execute the commands and carry out the will of the legislative authority. Thus, as to both its objects and uses, and the means by which they were to be attained, the State, having entire control of the institution, it is characterized as a public servant, its officers standing in the same relation.—Opinion of *Story*, J., 4 Wheat., 669.

The fact that it could bind itself and its resources by its contract, and become amenable to the judicial authority, does not alter this view of the case, for many public officers possess the same degree of competency without changing their relations to the public authority.

The respondents being public servants, as between the State and themselves, the Act of September 15 created a duty to deliver to the Governor the fund in question, to the extent of the control they might have over it, and, failing to do so, the State was entitled to a remedy to enforce the performance of such a duty.

That the act required was ministerial, and left nothing to the discretion of the respondents, results from the absolute character of the command, as well as from the nature of the act itself.

The act required is clearly and distinctly commanded as a specific duty, in which the State is alone concerned, so far as can be gathered from the statute.

The next question that arises is, whether any other specific remedy than that by *mandamus* has been provided. The statute in question provides no remedy, and, therefore, the question is

to be governed by general principles of law; for a case like the present *mandamus* is a specific remedy, devised for the very purpose of meeting the want of a general remedy by action. It meets the very case where a specific act ought to be performed and is withheld, and where compensation in some other form would not equally serve the public interest.

I must, therefore, conclude that the remedy has been well chosen, and proceed to the consideration of the grounds that have been urged as a bar to the present form of proceeding.

The respondents set up the pending of a suit in equity in the Court of Chancery of this State, in which Dabney, Morgan & Co. are complainants, and respondents and others are defendants, in which the complainants claim as bill-holders of the bank, and seek equitable remedies against the assets of the bank—also certain orders made in such suit—and contend that, by reason thereof, jurisdiction in this case is ousted, both as it regards the fund in controversy and the respondents who have its custody.

It is necessary to examine the grounds on which this claim rests.

Dabney, Morgan & Co. filed their bill in equity in October, 1867, alleging that they are holders of bills issued by the bank; that the bank is insolvent. They seek a discovery and account of the assets of the bank, and a decree annulling, as unconstitutional, an Act of the Legislature passed in 1865, so far as the same assumes control over such assets, and to create certain preferences in regard to the same, prejudicial to complainants; and also to be paid out of the assets of the bank, according to the rights and priorities adjudged to the respective creditors having claims, legal or equitable, thereon. They also ask an injunction and receiver of the fund.

The President and Directors of the Bank are made parties defendant to the original bill. The Attorney General was afterwards, with his consent, made a party in behalf of the State, for the purpose of validating the Act of 1865, and certain other creditors of the bank were likewise made parties defendant.

Answers were interposed by the several defendants—that of the bank, admitting its insolvency, and upholding the preferences created by the Act of 1865. The Attorney General answered in behalf of the State, enforcing the validity of the Act of 1865.

An order was made by consent, March 3, 1868, which, by anticipation, directed that, upon the coming in of the answers, or the bill being taken *pro confesso*, for want of an answer, the cause should stand referred to a Master to take proofs. Directions were given

for the Master to advertise for the appearance of the creditors of the bank. The President and Directors were also ordered to account before the Master for the "capital, property and assets" in their hands or under their control. The creditors of the bank were enjoined from prosecuting at law or in equity, except as parties to such suit, and Messrs. Furman and Waring, the President and Cashier, were enjoined from paying the assets to the creditors until the hearing. Instructions were given as to current expense, and as to changing the form of securities, and all parties were allowed leave to apply for additional orders.

The case has not yet proceeded to a hearing. Does the pending of this suit oust the jurisdiction asserted in the present case?

The general rule of law on this subject is well stated in Conkling's Treatise, page 273, as follows:

"The rule is this, that between Courts of concurrent jurisdiction, the Court that first attains possession of the controversy, or of the property in dispute, must be allowed to dispose of it finally, without interference or interruption from the co-ordinate Court. This well settled rule is equally applicable between Courts of Equity and Courts of Common Law, and between different Courts of Common Law; and it has repeatedly been asserted and enforced by the Supreme Court between the National and State Courts."

The decisions of the Supreme Court of the United States are entitled to the greatest weight, as bearing on this subject, even where not possessing conclusive authority, from the fact that the possession of Federal authority would naturally incline them to decide this rule within the narrowest limits, with a view to secure the largest efficiency within the necessarily limited sphere of original Federal jurisdiction.

*Taylor* vs. *Carryl* (20 Howard, 583,) is a striking illustration of this rule, arising out of a conflict between the United States District Court in Admiralty and a State Court acting under process of foreign attachment. The claim in Admiralty was for seamen's wages—in the State Court that of a general creditor having no lien upon the vessel, the subject of controversy, except that obtained through the foreign attachment. It was strenuously contended that the case of a libel for seamen's wages in Admiralty formed an exception to the general doctrine embraced in the rule above stated. The Court, however, was of opinion that the general

rule, as to co-ordinate jurisdictions, was applicable to the case, and sustained the authority of the State Court, which had first gained possession of the subject of the controversy. The cases in the Supreme Court, depending on this principle, were carefully considered in this case, and the rule vindicated, substantially, as laid down in Conkling's Treatise, above cited. Campbell, J., delivering the opinion of the Court, cites, approvingly, the authority of 3 Hare, 472, to the proposition that the "Court of Chancery does not allow the possession of its receiver, sequestrator, committee or custodee to be disturbed by a party, whether claiming by title paramount, or under the right which they were appointed to protect." He contends that the possession of the agent of the Court is the possession of the Court.

In *Wiswall* vs. *Sampson*, (14 Howard, 52,) a judgment creditor endeavored to. validate a sale of real estate, made by the United States Marshal, under a judgment of the United States Circuit Court, while the property was in the hands of a receiver of the Court of Chancery. The Court applied the rule in question to the case, holding that the sale made by the Marshal was absolutely void. Nelson, J., held that the possession of the receiver was the possession of the Court, and points out the method by which one claiming by superior title must intervene in Chancery in such a case.

So, in *Peale* vs. *Phipps*, (14 Howard, 368,) it was held that an action could not be brought in the United States Circuit Court against trustees appointed by a State Court to wind up the affairs of an insolvent corporation, they being amenable to the Court that appointed them, which had authority to apply the assets to the payment of claims against the corporation.

The application of this rule to the present case involves the following considerations: *First*, Whether the Court of Chancery has obtained the possession of the subject-matter of this controversy, or of the controversy itself; and, *Second*, Whether the rule is applicable to a case in which the public authority seeks to compel, by *mandamus*, the performance of a strictly public act.

In a strictly technical sense, the subject-matter of this controversy is an act of a public character, performance of which is claimed of a public servant who withholds the same; but as the doing this act involves a certain control over a specified fund, it becomes necessary to know whether, consistently with the rules of law, the act can be compelled in the manner that is proposed.

What is, then, the situation of the fund ? Had it been placed in the hands of a receiver, no question could arise as to its being in the hands of the Court that appointed him. Is it any the less so, in the present instance ? The Court has assumed not only the control of the fund, but has actually entered upon its administration. It has protected it from waste by injunction.· It has already, by anticipation, devoted it to certain uses. It has tied up every hand that could intermeddle with it, and opened the door of controversy to all making claims against it. The assets of the bank are no longer either capital or profits, but a *fund in equity*, as completely and actually as if in the hands of a receiver. · The President and Directors, if not receivers, have their responsibilities, and, in the language above cited, are at least "custodees." As it regards the fund, they are but the hands of the Court of Chancery.

But it is equally clear that the Court of Chancery has possession of the controversy, both as it regards the questions at issue and the parties. The State has intervened, in the person of its Attorney General, and submitted its right to that Court by answer. If that demand is too narrow, it can be made larger. The Court is bound to respect and maintain whatever claim the State may rightfully make upon the fund. The rights of the State, as they exist under the Act of 1868, are the same that existed at the time it interposed its answer. It has acquired no new title or grant of authority in relation to the fund. It could have claimed, by its answer, unlimited control over the assets, if it can do so now. It advances no claim that could not be considered by that Court, and it is to be presumed that Court, deriving its powers from the Constitution, will give due effect to all rights, public and private. A plainer case could not be conceived for holding that, so far as the question of co-ordinate jurisdiction is involved, the right to proceed in judicature,· had *private rights been alone concerned*, rests with the Court of Chancery.

But, can this rule be extended to a contest where the State claims, by the extraordinary remedy of *mandamus*, the performance of an act of a public nature, imposed by statute authority ?

The writ of *mandamus* is a remedy appertaining to the general exercise of judicial power, and, as such, is subject to all the rules that govern procedure in the Courts. If sued out by a citizen, for the purpose of claiming a purely private right, depending on the action of a public officer, it could not be contended, with any propriety, that, as a peculiar remedy, it was exempt from the opera-

tion of a rule intended to bind together all jurisdictions and remedies into a harmonious whole. It certainly would not be allowed to oust the Court of Chancery of its appropriate jurisdiction over a specified fund in controversy.

In the present case, however, the State is a real, and not a nominal party; and this is claimed as placing the case in a peculiar attitude to the rule in question. The State can neither be sued nor compelled to appear in its own Courts or elsewhere. Where it enters the Courts, it does so voluntarily, and, it is to be presumed, for the reason that some important object cannot be attained except through the aid of the judicial arm of the Government. But no proposition is more clear than that when the State places itself in the attitude of a suitor in its Courts, it subjects itself to all the rules that bind the jurisdiction from which it seeks relief. When it enters the Court of Chancery, it conforms to every requirement that binds the humblest citizen. When it claims the aid of the writ of *mandamus*, it takes it subject to all the rules that control its employment. It follows, therefore, that the same rule must be applied in the present case that would govern in a case of private rights, and, accordingly, that, regarding the State as a claimant to the fund in question, an insuperable objection exists to the exercise of the jurisdiction claimed in these proceedings.

It has been hitherto assumed that the demand of the State is to the absolute control of the fund in its own right, and for such uses as it may see fit to declare. Another view of the Act of 1868 has been presented, which demands consideration. It is contended that the Act merely contemplates a change in the custodian of the fund, without necessarily diverting it from any uses to which it may have become appropriated by law. It is said that the Legislature may rightfully designate the proper persons to have the custody of funds in suits pending in the Courts, and that, in the present instance, they have fairly exercised that power; that, in such a case, the Courts have no more right to complain than they would if the writ of *mandamus* was sought to compel a Master in Equity to surrender to the Clerk of Common Pleas funds in his possession, on the legal transfer of the duties of his office to the last named officer; that, in such event, the fund still remains subject to the order of the Court, though actually held in different hands.

On this supposition, the statute of 1868 would have to be regarded as remedial, rather than as an assertion of a right to control the dedication of the fund.

This question is one of delicacy and importance, and, as such, has received full and serious consideration. Time allows only a statement of the conclusions arrived at.

A careful examination of the statute, both as to its terms and general scope, allowing, in favor of the legislative action, every reasonable intendment, affords no sufficient ground for holding it to be intended as a remedial statute. The Governor could find in it no authority to make any other disposition of the fund than such as might be prescribed by appropriations made by the Legislature. The designation of the Governor, in his name of office, as the custodian—an officer who cannot, in his official character, as Executive of the State, be reached by the process of the Courts—seems to exclude the idea that it was not the intention of the Act to remove the fund from the control of the Court.— *Governor Georgia* vs. *Madrazo*, 1 Pet., 110. The direction to sell at public auction, with direct reference to the interests of the State, is inconsistent with the principles governing the disposition of equitable funds. Viewing the provision made in the statute for funding a portion of the bills of the bank, in connection with the clauses empowering the Governor to seize the fund, and the inevitable inference is, that the Legislature fairly concluded that such provision satisfied all legal and moral claims upon the fund, and left it at liberty to employ it as a means of satisfying the general indebtedness of the State, part of which arises from the issue of bonds to satisfy the demands of the billholders of the bank. In this view, the statute can only be regarded as an assertion of a proprietary claim to the fund, and, as such, we have seen that the appropriate tribunal before whom that claim should be asserted is the Court of Chancery that has possession of the fund.

The respondents have urged various other matters in bar of the proceedings, which, under the view taken of this case, are not important to be considered. Among the objections urged is, that the Act of 1868 is invalid, under the Constitution of the United States, as impairing the obligations of the contracts of the bank and the State with the creditors of the bank. As I may be called upon, at some future time, as a member of the Supreme Court, to pass upon the question, it is manifestly appropriate that no expression of views on that subject should be made when not imperatively demanded by the case before me.

The rule to show cause will be discharged.

State *vs.* The Bank of the State of South Carolina.

The case was then removed into this Court by writ of error, where it was now heard. ·

*Chamberlain*, Attorney General, and *Corbin*, for plaintiff in error.

*Campbell, Hayne,* for defendants in error.

March 9, 1869. *Per Curiam.* This cause came on to be heard on the transcript of the record from Associate Justice Willard, sitting in Chambers, at Charleston, and was argued by counsel.

On consideration whereof, it is now here ordered and adjudged by this Court, that the rule for the *mandamus* be dismissed, because so much of the Act (No. 17) entitled "An Act to close the operations of the Bank of the State of South Carolina," as authorizes and requires the Governor, "for and on behalf of the State, to take possession of all the real and personal estate, assets, choses in action and books of account of the corporation known as the President and Directors of the Bank of the State of South Carolina, in whose hands soever found, and sell at public auction, at such times and upon such terms as he shall deem most advantageous to the State, all the real and personal estate, stocks, bonds of the corporation, and other assets of said corporation, and the personal bonds, notes and bills of exchange owned by said corporation," is in conflict with Article 1, Section 10, Par. 1, of the Constitution of the United States, which provides that "no State shall pass any law impairing the obligation of contracts."

The opinion of the Court will be filed hereafter.

April 8, 1869.   The opinion of the Court was now delivered by

Moses, C. J.   The information before us was filed by the Attorney General of the State, on behalf of the State, praying a rule against the respondents to show cause why a writ of *mandamus* should not be awarded, commanding them to deliver to His Excellency the Governor of the State all the real and personal estate, assets, choses in action, and books of account of the corporation known as " The President and Directors of the Bank of the State of South Carolina," required by the Act entitled " An Act to close the operations of the Bank of the State of South Carolina," passed by the General Assembly on the 15th day of September, 1868.

The respondents submitted cause, and the matter came for hear-

ing before Associate Justice Willard, at Chambers, who, after full argument, discharged the rule, and, by writ of error, it is brought to this Court.

Among the grounds urged by the respondents against the rule, it is averred that so much of the said Act as authorizes and requires the Governor, for and in behalf of the State, to take possession of all the assets, real and personal estate, choses in action, and books of account of the corporation known as the Bank of the State of South Carolina, and sell, &c., and directs that the proceeds of sale and all collections shall be deposited in the Treasury of the State, subject to the order of the Governor, is in violation of Article I, Section 10, Paragraph 1, of the Constitution of the United States, which declares that "no State shall pass any law impairing the obligation of contracts."

As this objection is sustained by this Court, it is not necessary to review the ground on which the Associate Justice rested his decision, or the other points submitted by the respondents.

In 1812, the General Assembly, by Act, (8 Stat. at Large, 24,) established "a bank in the name and on behalf of the State of South Carolina." It was "made a corporation and body politic, by the name and style of the President and Directors of the Bank of the State of South Carolina." Under the charter, extended from time to time, it was, as such, to continue until the first day of January, 1871.—Act of 1833, 8 Stat. at Large, 67 ; Act of 1852, 12 Stat. at Large, 149. It was made able and capable, in law, to have, purchase, receive and possess real and personal estate, and the same to sell, demise, grant, or dispose of, to sue and to be sued, to ordain and establish by-laws, ordinances and regulations for its government, and, generally, to do and execute all and singular such acts, matters and things which to them it shall or may appertain to do, subject to the rules, regulations, restrictions, limitations and provisions prescribed in the Act.

The whole capital was furnished by the State, consisting of all the stocks, bonds and notes belonging to the State, and the unexpended money in the Treasury ; and all taxes hereafter to be collected on account of the State were to be therein deposited, to aid and facilitate its operations, subject to drafts on the part of the State, authorized by legal appropriations ; and "the faith of the State was pledged for the support of the said bank, and to supply any deficiency in the funds specifically pledged, and to make good all losses arising from such deficiency."

It was invested, by its charter, with all the rights and powers generally used, exercised and enjoyed by banking companies.

In December, 1865, the General Assembly, by Act, authorized the President and Directors to close the branches and agencies of the said institution, and required that the principal bank in Charleston should cease to be one of issue, but should continue to act as a bank of deposit until further action of the Legislature.

The bank was a distinct corporation. Although its capital was furnished by the State, its profits to inure to the benefit of the State, and "the faith of the State was pledged for its support, and to supply any deficiency in the funds specifically pledged, and to make good all losses arising from such deficiency," still, though brought into existence by the State, the legitimate administration of its affairs, within the limits of its charter, created business relations and associations, founded upon the credit of its capital, property and profits. In all its transactions, these were looked to and accepted as the basis of its credit and responsibility.

While it continued solvent, it was a matter of little consequence to a creditor how far, or to what extent, the Legislature interfered by its control.

When, however, the fact of its insolvency is apparent, whether the State is the sole stockholder or a co-stockholder with individuals, the fund which it supplied as capital no longer remains, and to allow it to claim and hold the assets of the Company would be depriving the creditors of their right, and, in fact, using the assets as the means of reimbursing the stockholder, to their utter wrong and injury.

The assets of the bank are all that is left to meet the debts of the corporation, and, if they are taken by the State from the hands of those who hold the title for the purposes designed by the charter, and who are amenable to suit, where is the remedy which the creditor held in his right of action?

It does not at all change the nature of the relation of the bank to its creditors, that the State was the sole owner of the capital. The State, in its sovereign capacity, is distinct and separate from the bank. When it established a trading corporation, did it invest it with any of its sovereign power? or, because the State was the sole stockholder, did the charter which it conferred acquire any higher power by reason of the *status* of the stockholder, or were the judicial tribunals of the State to construe it by any other rule

than that by which they would be guided if the corporation consisted alone of private persons ?

On the contrary, when a State invests its funds, either alone or with others, in a banking or other company, it does not carry into it any of the elements of its sovereign powers, but occupies the bare position of any other stockholder. — *The Bank of the United States* vs. *The Planters' Bank of Georgia*, 9 Wheat., 907 ; *Bank of Commonwealth of Kentucky* vs. *Wister*, 2 Pet., 318.

In the case last referred to, Mr. Justice Johnson, delivering the opinion of the Court, remarks, "that the case of the Bank of Georgia was much stronger for the defendant, for there the State of Georgia was not only a proprietor, but a corporator." Here, as in the Kentucky case, the State was only proprietor, for, by the Act, the President and Directors were the real corporators.

It was conceded, in the learned argument for the relator, " that where a common bank becomes insolvent, its assets should be distributed to its creditors, but that this proposition is not applicable to the present case : 1st, Because the capital of the bank was, and is, the property of the State, furnished and deposited by the State, consisting of specific funds, the annual accumulations thereof, and the unexpended money of the State derived from taxes ; and, 2d, Because the *faith and credit* of the State was, and is, pledged to the support of the bank."

The authorities above referred to, and many others which may be cited from the reported decisions of the Supreme Court of the United States, abundantly shew that the fact of the capital having been furnished by the State does in no way vary or affect the responsibilities of the corporation to its creditors, and the rights of those creditors, as against a corporation with which they dealt, looking to the grants in the charter as the security for their debts.

Then, is this conceded proposition (by the counsel of the relator) as to private banks, affected by the consideration of the pledge of the faith of the State to the support of this bank ?

We desire to be understood as not committing ourselves to any expression of opinion as to the extent (if any) the State may be regarded as bound for the liabilities of the bank under the language of its charter. To give, however, full effect to the point made by the relators' counsel in this regard, we will, for the purpose of the argument, adopt their language, in the sense they desire it understood.

This view of the counsel presents the case as if the bank was the debtor, and the State the surety or guarantor.

If that be the relation, and the State holds the assets of the bank for its protection as surety, has not the creditor the right to claim the benefit of them, and that they shall be specifically bound for application to his debt? Has he not the right to demand all the securities which the guarantor holds for his protection?— *Maure* vs. *Harrison*, 1 Eq. Cases, Abr., 93; *Yonge* vs. *Reynell*, 9 Hare, 809; *Moses* vs. *Murgatroyd*, 1 Johns. Ch., 129; *Phillips* vs. *Thomson*, 2 Johns. Ch., 418–422; *McCollum* vs. *Hinckley*, et al., 9 Vermont, 143–149.

Although this doctrine of subrogation, or substitution, is a creature of the Court of Equity, yet it attaches, in all its force, whenever the relation of debtor, creditor and surety exists, and extends its protection, not as part or parcel of the contract, but as an incident attaching to the remedy, by which the various rights of these several parties are guarded and protected.

If the State, at its own option, can, then, transfer the assets of the bank from the hands in which they were placed by the charter, the creditor at least loses the indemnity which they constitute; and, even assuming that the State is bound, he is cut off from one of the sources through which his debt may be made available.

"The obligation of a contract, in the sense in which those words are used in the Constitution, is the duty of performing it, which is recognized and enforced by the laws. And if the law is so changed that the means of legally enforcing this duty are materially impaired, the obligation of the contract no longer remains the same." This is the language of Mr. Justice Curtis, while in the Supreme Court.

The learned and chaste opinion of Chief Justice Dunkin, in the *State* vs. *Carew*, 13 Rich., 498, reviews, with so much care and ability, the various authorities to which we have been referred as giving the just and proper construction to the clause of the Constitution now in question, that it would be a fruitless work to enter on a field where he has left nothing untouched.

His examination adopts, as a principle consequent to the said clause of the Constitution, the language of Mr. Justice Washington, in *Green* vs. *Biddle*, 8 Wheat., 1, (followed by various decisions, both Federal and State,) that "if the Acts so change the nature and extent of existing remedies as materially to impair the rights and interests of the owner, they are just as much a violation of the compact as if they directly overturned his rights and interests."

If the property of the debtor is withdrawn from the operation of

all legal process, the remedy is virtually lost. It can not be urged that, because the right of action is left, the remedy is untouched. When that which renders the right of action alone valuable—because, through it, satisfaction of the debt may be obtained—is entirely destroyed, is it not as virtually affected as if prohibited by law? The right to sue remains, but with the certain knowledge that the judgment will be a barren one. What does this Section of the Act propose? To take from the custody of the bank—a separate and distinct corporation—all its real and personal property, place it in the hands of the Governor, who shall sell the same, and the proceeds, with the collections that may be made of its *choses in action*, shall be deposited in the Treasury, to be held subject to his order. Not only are the funds of the bank to be abstracted from the custody where, by the charter, they are committed, and, without even a direction that they shall be held as a trust for the benefit of its creditors, they are to be in a position where they may be appropriated by the Legislature to any purpose, with no guide but its will.

The case of *Curran* vs. *The State of Arkansas*, 15 Howard, 304, is so analagous to this, that it is difficult for a mind ingeniously bent on discovering a difference to find it. In fact, the case before us is weaker in one particular than that of Curran.

The Bank of the State of Arkansas was incorporated by that State in 1836, with the usual banking powers.

The capital was raised by the sale of bonds of the State, with other certain sums paid by the State. In January, 1843, the bank being insolvent, the Legislature passed an Act to liquidate and settle its affairs, but continued its operation, and subjected its management to a financial receiver and attorney, who were to collect its assets and apply them to the redemption of the outstanding circulation of the bank. At the same time, bonds of the State, held by the bank for money borrowed by the State, were required to be given up and cancelled, and their amount to be credited to the bank, against a part of the capital stock it furnished. From time to time Acts were passed withdrawing specie and other funds from the bank, and all its real and personal property was declared to be vested in the State. Curran, who was a billholder, instituted suit, recovered judgment, the executions on which were returned unsatisfied. He then filed a bill in equity against the State, the bank, the receiver and attorney, following the assets of the bank, and requiring that they

should be subjected to the payment of his debt. The Supreme Court of the United States, disaffirming the order of the Supreme Court of the State of Arkansas, dismissing the bill, granted the relief sought, on the ground that a law which deprives a creditor of all legal remedy against the property of his debtor impairs the obligation of the contract, and is invalid.

The case before us is, in fact, more obnoxious to the prohibition of the Constitution, for the State of Arkansas, by its Constitution and laws, may be made a party in Court by suit.

Here the creditor is remediless, for there is no legal liability on the part of the State. It cannot be held to answer before the judicial tribunals of the country; and when a contract was entered into with a corporation created by it, the party contracting looked not to the faith of the State, which was intangible and beyond its reach, but to the property of the corporation, which, by due course of legal procedure, could be subjected to the satisfaction of his debt.

There are other sections of the bill not depending on or connected with the first, and distinct and separate from it. We are not to be understood as passing upon them.

The order dismissing the rule in this case has been already filed.

*Carpenter,* J., sitting in place of *Willard,* A. J., concurred.

*Hoge,* A. J., not present to sign opinion, also concurred.