## Case No. 7,242.

In re JAYCOX et al.

[8 N. B. R. 241.] [1]

District Court, N. D. New York. March 13, 1873.

---

[1] [Reprinted by permission.]

Mr. W. C. Ruger, for opposing creditors, and Mr. Hiscock, assignee in person,

Mr. George F. Comstock, in support of the claims sought to be expunged,

HALL, District Judge. The main or final question now to be determined—that of the right of the creditors holding notes of the bankrupts endorsed by Judge Comstock and embraced within the terms either of the mortgage of the real estate or the pledge of the personal property of the bankrupts given by them to the endorser to secure the payment of such notes and indemnify him against loss by reason of such endorsements, are entitled to prove and take dividends upon the whole amount of their claims, as unsecured debts—is the same as that presented when the parties to the present controversy were before this court some weeks since,—In re Jaycox [Case No. 7,240],—but the minor or subordinate questions, upon which the determination of the final question must depend, are not in all respects the same. Indeed, one of the most important of the subordinate questions is now, for the first time, distinctly presented for a final decision, while many questions which were then open to discussion have been effectually disposed of by the stipulations of the parties. At that time the holders of such notes might have been allowed to withdraw the proof of their debts as unsecured debts, and then to prove them as partially secured by the mortgage or pledge given by the bankrupts to the endorser, but the execution of the release referred to in the special case, and the persistent assertion of their right, under the proof made, to dividends on the whole amount of their debts, with a full knowledge of the existence of such mortgage and pledge, must be considered as an absolute abandonment and release of all right to the security, if any, which they once "had," (as that term is used in the bankrupt act,) under such pledge and mortgage. On the other hand, all objections to the form or sufficiency of the depositions by which such debts were proved are waived, and the number of subordinate questions is much reduced by the stipulations contained in the special case. Besides, the most material subordinate question formally presented, and the one chiefly discussed by counsel and court on the former application, has, perhaps, been entirely avoided—or it may be but postponed for litigation in a different form—by such release, and the continued prosecution of these claims as unsecured debts entitled to dividends upon the full amount due.

The questions now to be determined have been very ably and elaborately argued by learned and eminent counsel, after a much more careful and thorough preparation than is usual, even in the most important cases, in this court. The citation of numerous authorities, and the elaborate but condensed arguments submitted in the written briefs, attest this, and the court gratefully acknowledges the relief from much labor in searching for authorities, and the great aid to the final decision of the case, thus afforded by the counsel. It has not, however, been deemed necessary to examine all the authorities cited. Many of the books referred to are not found in my own library, and the decisions of the courts of other states, in regard to the rights and remedies of creditors in respect to counter securities given by the debtor to sureties secondarily liable for their debts, have not, as a general rule, been examined, except as they are recited upon the briefs furnished, because the question of the extent and character of the rights and remedies of the creditors whose right to prove for the whole amount of their debts is now contested, as against the surety endorser, and the securities held by him, must depend wholly upon the established doctrines of the courts of this state, which is the domicile of all of such creditors and of the endorser, and in which the lands and property mortgaged or pledged are situated. The decisions of the New York courts upon this question have been, for more than half a century, uniform, distinct and decisive. In 1850, in Vail v. Foster, 4 Comst. [4 N. Y.] 312, Chief Justice Bronson, confessedly one of the ablest and most learned of the eminent jurists who have adorned the bench of the highest courts of the state, in delivering the unanimous opinion of the court of appeals, said: "It is a settled rule in equity, that the creditor shall have the benefit of any counter bonds or collateral securities which the principal debtor has given to the surety, or person standing in the situation of a surety, for his indemnity. Such securities are regarded as trusts for the better security of the debt, and chancery will compel the execution of the trusts for the benefit of the creditor." Again, after stating the facts peculiar to that case, he said: "We have, then, the ordinary case of creditor, principal and surety, to which the rule in question has been applied, and the mortgage which the principal debtor has given to the surety must be considered as a trust for the security of the debt, which a court of equity will enforce for the benefit of the creditor."

The doctrines thus announced by the court of appeals have been repeatedly and fully sanctioned by the courts of this state. And since the case of Moses v. Murgatroyd, 1 Johns. Ch. 119, decided by Chancellor Kent in 1814, if not ever since the case of Neilson v. Blight, 1 Johns. Cas. 205, decided by the supreme court of this state in 1799, those doctrines have been considered part of the well settled law of the state. The case of Moses

v. Murgatroyd was in many of its features much like the present, and Chancellor Kent in his opinion (the endorser having died intestate) said: "The assignment * * * though absolute on the face of it, was intended, by the parties to it, to be a security only to the intestate for his endorsement of the notes in question. This being the case, the plaintiffs, as holders of the notes, are entitled to the benefit of this collateral security given by their principal debtor to his surety, and the case of Maure v. Harrison (Mich. 1692) 1 Eq. Cas. Abr. 93, (K.) 5, is directly to this point. These collateral securities are, in fact, trusts created for the better protection of the debt, and it is the duty of this court to see that they fulfill the design. And whether the plaintiffs were apprized at the time of the creation of this security is not material. The trust was created for their benefit, or for the better security of their debt, and when it came to their knowledge they were entitled to affirm the trust and to enforce its performance. This is the principle assumed in the case of Neilson v. Blight, 1 Johns. Cas. 205." In Haggarty v. Pittman, 1 Paige, 298, 299, Chancellor Walworth said: "Where the assignment is to a surety for his indemnity, the creditor has an equitable claim upon the fund for the payment of his debt, and the surety has no right to divert it to any other object;" and in support of this doctrine he cited, among other cases, Bank of Auburn v. Throop, 18 Johns. 505, decided in 1821. In Pratt v. Adams, 7 Paige, 615, 627, Chancellor Walworth, in respect to a provision in the assignment of Benjamin Rathbun made after the indebtedness had accrued and without the knowledge of the creditor, said that it "was intended as an indemnity to James and other accommodation acceptors and endorsers against their liabilities, and to furnish them with a fund to discharge those debts. And it has been settled by a long course of judicial decisions, that when a person standing in the situation of endorser or surety is furnished or provided, by the principal debtor, with a fund or with collateral security for such a purpose, the creditor is in equity entitled to have it applied in satisfaction of the debt." The same learned chancellor, in Curtis v. Tyler, 9 Paige, 432, declared it was well settled, "that when a surety or person standing in the situation of a surety for the payment of a debt receives a security for his indemnity and to discharge such indebtedness, the principal creditor is in equity entitled to the full benefit of that security, and it makes no difference that such principal creditor did not act upon the credit of such security in the first instance, or even know of its existence." And in Halsey v. Reed, Id. 452, the first of these propositions was again affirmed. See, also, Weston v. Barker, 12 Johns. 276; Shepard v. Shepard, 7 Johns. Ch. 57, 63. The decisions in Phillips v. Thompson, 2 Johns. Ch. 418; Clark v. Ely, 2 Sandf. Ch. 166; and Ten Eyck

v. Holmes, 3 Sandf. Ch. 428,—were based upon the same doctrine, though it is true that in the latter case the vice-chancellor speaks of the relation of the surety to the creditor as one of quasi trust.

It is believed that the doctrines established by the cases cited have not been denied in this state in any reported case; and Chancellor Kent in his Commentaries (volume 4, page 307), says: "If a trust be created for the benefit of a third person without his knowledge, he may, when he has notice of it, affirm the trust, and call upon the court to enforce the performance of it. Collateral securities given by a debtor to his surety are considered as trusts for the better security of the creditor's debt, and chancery will see that their intention be fulfilled;" and Story, Eq. Jur. § 638, declares that "if a principal has given any securities or pledges to his surety, the creditor is entitled to all the benefit of such securities or pledges in the hands of the surety, to be applied in payment of his debt." And the proposed Civil Code prepared by Messrs. William C. Noyes, David Dudley Field and Alexander W. Bradford, and reported to the legislature in 1865, gives the rule of law in this state as follows: "Sec. 1572. A creditor is entitled to the benefit of everything which the surety has received from the debtor by way of security for the performance of the obligation, and may, upon the maturity of the obligation, compel the application of such security to its satisfaction." And see the cases of Eastman v. Foster, 8 Metc. [Mass.] 19, and New Bedford Inst. for Savings v. Fairhaven Bank, 9 Allen, 175, hereinafter cited.

In view of the authorities cited, the learned counsel for the claimant very properly said, in the opening sentence of his brief: "We concede at the outset that in all cases where an endorser or other surety has a counter security from the principal debtor, the creditor is entitled to the benefit of it in equity, if necessary to resort to it for the satisfaction of the debt." But this being thus broadly conceded it is insisted that the claimants in this case were never within that provision of the twentieth section of the bankrupt act, which declares that "when a creditor has a mortgage or pledge of real or personal property of the bankrupt, or a lien thereon for securing the payment of a debt owing to him from the bankrupt, he shall be admitted as a creditor only for the balance of the debt after deducting the value of such property * * * or the creditor may release or convey his claim to the assignee upon such property, and be admitted to prove his whole debt."

The term "has" contained in this provision, is or may be of broader signification than the term "holds," and while it must be conceded that the claimants have at no time "had" a legal title or strictly common law right to any mortgage, pledge, or lien upon the property of the bankrupts, which could be directly en-

forced by them under the strict and technical rules of the common law, there is certainly much reason for believing that under the authorities already cited the claimants "have had," and when they appeared to make proof of their debts in this case still "had," in equity and potentially, (by means of the mortgage and pledge held by Judge Comstock,) a mortgage, pledge or lien upon the property of the bankrupts for securing the payment of their debts, within the intent and meaning of the provisions just quoted.

In opposition to this view the learned counsel for the claimants has submitted an ingenious and elaborate argument, some portions of which will next be examined. Immediately following the concession just quoted, he says: "But the foundation of the creditor's right is or may be the important thing to be considered in reference to many collateral questions. In this case the true theory of the right is, or may be, the vital point to be ascertained. And first, if in the creation of the security it is the intention of the principal debtor to place in the hands of his surety a fund for the benefit of the creditor, the principle is plain. We have a technical and strict trust with all the characters which belong to such a relation, the author of the trust, the trustee, and the beneficiary. The right of the creditor, as the beneficiary, to resort directly to the trust fund is so plain as not to need discussion." And it is in respect to such technical and strict trusts thus expressly created that in a subsequent part of his brief he says: "The creditor in such a case may be called the real owner of the trust fund, and, perhaps, may be within the provision of the bankrupt act, which requires a creditor to give up his security before he can prove his debt against the principal." Immediately following this he says: "If, on the other hand, there is no trust, in other words, if the transaction is between the debtor and the surety without any declaration of trust, and the protection of the surety is the real object, then the benefit to the creditor is incidental. He has no right or title in or to the fund, and can only insist that the fund shall be fairly applied (if necessary) to the purpose of paying the surety's (not the principal's) debt. But why can he so insist? In the absence of a trust to pay over, what is the foundation or theory of the creditor's right? We think it is sometimes called a right of substitution or subrogation."

It is, perhaps, a sufficient answer to the first portion of this argument to say that the authorities already cited conclusively prove that even in the case last supposed there is a trust which it is the duty of courts of equity to enforce, although the creditor or beneficiary had no knowledge of the existence of the trust for months after its creation, and only learned its existence just prior to the filing of his bill to enforce the trust; and that the alleged distinction between the two classes of trusts sought to be established has never been deemed material by either of the learned judges of this state who have acted upon the doctrines of the cases which have been cited. Indeed, the cases cited were, it is believed, all, or nearly all, cases of implied trusts, and belonged to the same class with the cases intended to be described by the learned counsel as those in which the transaction is between the debtor and the surety, without any declaration of trust, and the protection of the surety is the real object, and "the benefit to the creditor is incidental." But if such a distinction exists is it not a distinction without a difference, either in substance or effect, even when considered in respect to collateral questions? Is it material whether the parties to the transaction have expressly declared their determination to create a trust, or the law has indelibly impressed upon the transaction the terms of an implied trust of the same character, and with the same consequences, as between the parties interested? The rights of the creditor under either must be enforced in a court of equity, and are not recognized or enforced in strictly common law actions, but in equity the implied trust and the express trust are held to be equally binding upon the surety, and the implied trust will be enforced as readily, as vigorously and as effectually as the other. In equity and, indeed, at law, the rights of the creditor are precisely the same in either case, and for that reason there can be no essential or material difference in the two cases under the provisions of the bankrupt act. Nor is it supposed that it would make any difference in the rights or remedies of the parties now before the court if it were to be conceded that the learned judges of this state have been mistaken in considering these cases as cases of trust, and, therefore, within the jurisdiction of the courts of equity as trusts, instead of assigning them to some other head of jurisdiction, such as fraud or account, or calling the right of the creditor a right of substitution or subrogation. If the end is properly reached by the action of the court it is not material to what head of equity jurisdiction the case properly belongs; but I am unable to perceive that there is any reason for doubting that it is properly assigned to that branch of equity jurisdiction which recognizes and enforces trusts. To what other head of that jurisdiction, unless it be that of fraud, can it be so properly assigned? And is there anything in the rights of creditors, as declared and enforced in the cases referred to, like the right of substitution or of subrogation as recognized in the civil law, or indeed in any other law? I think not.

The whole force of the argument of the learned counsel upon this point appears to me to rest upon an assumption. His proposition, stated in his own language, is as follows: "An endorser or surety having a counter security under no trust to pay over in discharge of the principal's debts, simply holds the security as his own means, or

part of his own means of paying and satisfying his own obligation." This assumption and the argument founded upon it seems to me to be "an inversion of the law and logic of the case, because it assumes a conclusion and then reasons backward to the premises." Besides, the conclusion is assumed in direct opposition to the decisions of our highest courts in the numerous cases cited, and in total disregard of the principle affirmed and acted upon in those cases, and which Assistant Vice-Chancellor Sandford declared, in Ten Eyck v. Holmes, in 1826, was settled a century and a half before.

The assumptions that in the class of cases referred to "the benefit to the creditor is incidental," and that "he has no right or title to or in the fund, and can only insist that the fund shall be fairly applied (if necessary) to the purpose of paying the surety's (not the principal's) debt," are likewise in direct and palpable conflict with the settled law of this state, as shown by the cases cited; and even the learned counsel concedes that the funds thus furnished him cannot be used by the surety in the payment of any debt of his, other than the one for which the principal was primarily liable, and which will necessarily be paid whenever such fund is applied in discharge of the liability of the surety. The assumption that the funds furnished by the principal debtor, and which, when applied by the surety in discharge of his liability, necessarily pays and discharges the debt of the principal and primary debtor, is not applied in discharge of the principal's debt, requires no further answer. The use of the words "if necessary" in this proposition of the counsel, and other portions of his argument, indicates that the creditor's right to the counter securities in the hands of the surety exists only in case of the insolvency of the latter, but no such limitation is recognized in the reported cases, cited in the report of the civil code commissioners, or by Kent or Story; and it would be absurd to require the creditor to wait until he could prove that he had lost a portion of his security by the insolvency of the surety before resorting to the trust fund. If, as the learned counsel concedes, the surety has no right to use the fund except for the discharge of the debt for which he is liable as surety, there can be no reason for allowing him an opportunity to dispose of it in fraud of the creditor's rights, or to hold it against the rights of the creditor, until the principal and the surety himself both become insolvent; perhaps after the fund has been fraudulently used by the surety. By discharging his own liability he can free the fund or securities in his hands from any equitable lien or claim of the creditor, but until he does so it is clear that the creditor has the stronger equity, and one which he should be allowed to enforce.

It is not denied that the cases cited by the learned counsel for the claimants, from the reports of other states, recognize the general rule that the counter securities in the hands of the surety cannot be diverted to any use other than the payment of the debt for which the surety is liable, but it is insisted that these cases do not recognize or suggest the existence of a trust enforceable by the creditor, but are based upon some unnamed equitable right of a different character. But these cases, so far as they have been examined, do not, in my judgment, give much support to the positions assumed by the counsel, either in respect to the non-existence of a trust in cases like the present, or in respect to there being a material distinction between the two classes of cases which have just been mentioned. In nearly all of the reported cases decided in other states the case of Maure v. Harrison, 1 Eq. Cas. Abr. 93, has been cited with approbation as the origin or first reported announcement of the right conceded to the creditor as against the surety, and the very few cases which furnish slight evidence that there was supposed to be a substantial difference or material distinction in this respect between the cases of an express and of an implied trust, or that no trust existed unless created by words expressly declaring such trust as a security to the creditor, are regarded as so far exceptional, and as opposed to the general current of authorities. The three cases mainly relied upon are Homer v. Savings Bank, 7 Conn. 478; Ohio Life Ins. & Trust Co. v. Reeder. 18 Ohio, 35; and Ex parte Waring, 19 Ves. 345.

In the last mentioned case, Bracken & Co. had an account with Brickwood & Co., bankers in London; drawing upon them, and lodging in their hands, from time to time, bills and other securities against their drafts. Brickwood & Co., at the time of their bankruptcy, July 7th, 1810, were under acceptances for Bracken & Co. to the amount of twenty-four thousand pounds and indebted to them in a cash balance of six thousand seven hundred and sixty-six pounds, seven shillings and six pence, having also in their hands, in short bills, twenty-one thousand six hundred and forty-five pounds, ten shillings, and also the title deeds of premises in London, as security against their acceptances, which last produced by sale near two thousand nine hundred and sixty-one pounds. On the 2d of August, 1810, Bracken & Co. also became bankrupt. The holders of the acceptances, with the exception of about six hundred pounds, had proved their debts under both commissions, and dividends thereon had been paid from Brickwood's estate, to the amount of three thousand four hundred and twelve pounds. The holders of the bills and the assignees of Bracken & Co., severally, claimed the cash balance and the securities, or their proceeds. The report seems confused and unsatisfactory, but it apparently shows that Lord Chancellor Eldon decided that "the bill holders must be paid, not as having a de-

mand upon these funds in respect of the acceptances they hold, but as the estate of Brickwood & Co. must be cleared of the demand by their acceptances, and the surplus, after answering that demand, must be made good to Bracken & Co." In this case Brickwood & Co., when they accepted the bills of Bracken & Co. as well as at the time of the bankruptcy, probably had a large cash balance (as well as the other securities) to enable them to meet their acceptances. As between the creditors and Brickwood & Co., the latter were the principal debtors for the full amount, and, to the extent of the cash balance, they were the principal debtors as between the drawers, Bracken & Co., and themselves. The case was mixed and peculiar; there is nothing in the case to show that the doctrines of principal, and surety, and creditor were strictly applicable, because it does not appear to what extent the acceptances were given without cash funds of the drawers in the hands of the acceptors at the time of the acceptances, and yet the right of the bill holders was upheld. It is true it was not done upon the ground of an implied trust, but of the equities of the parties, and the case is not so reported as to show under what arrangement or understanding the short bills referred to were deposited with or transferred to Brickwood & Co. If they were so transferred that the title to them passed, and Bracken & Co. became liable thereon as endorsers to Brickwood & Co., no trust would result or be implied, but Brickwood & Co. would only be liable for the balance of the final account between them and Bracken & Co. In re Boldero, 19 Ves. 25, 33, 47.

The case of Ohio Life Ins. & Trust Co. v. Reeder, 18 Ohio, 35, is a peculiar case, not only in respect to the form in which the question was presented, but in the reasons given for the decision. In the case of Green v. Dodge, 6 Ohio, 80, and other Ohio cases, the general doctrine as announced in Equity Cases Abridged, and fully established in this state and elsewhere, had been acted upon, and the existence of the implied trust in favor of the creditor fully recognized; and the case in 18 Ohio was decided against the complainant, not upon the ground of the existence of any implied trust, but upon the ground that it did not appear, (the suit being in equity) that the plaintiff had not a full and adequate remedy at law. The bill alleged that Henry L. Reeder, the first named defendant, made, to Nathaniel Reeder, two mortgages of his real estate, conditioned, among other things, to secure and save said Nathaniel harmless against certain endorsements that he had made for said Henry L. to several banks in Cincinnati, amongst which were three payable to the plaintiff; that the plaintiff still held two of such notes which had been regularly protested for nonpayment, and the endorser charged, and that both Henry L. and Nathaniel Reeder neglected and refused to pay such notes, and it

simply prayed that the mortgaged premises might be sold, and the proceeds applied to the payment of such notes. It does not appear by the report what other parties were made defendants.

It will be seen that the object of the bill was not the enforcement of an implied trust, as against the surety, but the direct foreclosure of a mortgage, the legal title of which still remained in the surety, and it was urged by the defendants that, as the mortgagor, the maker of the notes was in possession, his right might be sold on a judgment at law, as well as that there was a distinction between the case then before the court, and other cases which their counsel stated, as follows, viz.: "When the security is given with the intention that it shall be applied for the payment of the debt, and in exemption of the surety, he (the surety) is a mere trustee for the creditor, and substitution may be decreed, but when the security is to indemnify the surety only against payment of the debt, it is personal to the surety, and there can be no substitution." It was also insisted that Nathaniel Reeder had never been damnified, that for aught that appeared by the bill he might never be; that he even had no claim under the mortgage, because the condition of it had not been broken.

In delivering the opinion of the court Judge Caldwell, apparently recognizes the distinction insisted upon by the defendants. He says: "Now it will be seen that these mortgages are not given for the purpose of securing the complainant's claim, nor for the purpose of raising a fund out of which the debt was to be paid. If so, a court of chancery would hold the mortgagee as trustee of complainants and would subject the property to the accomplishment of the objects of the trust. The mortgages were given to Nathaniel Reeder for his own personal benefit and security to save him harmless from his liability as endorser, and can only be resorted to, either by him or the complainants, when it becomes necessary to effect that object. When the contingent necessity contemplated by their creation has arisen, * * * the endorser remains unharmed from his liability and there is nothing alleged that shows that he will not always remain so. * * * The Ohio Life and Trust Company seek in this case to be substituted to the rights of Nathaniel Reeder in a contract made with him personally for his own benefit; they can only claim such rights as enured to him; he has not been damnified, the conditions of the mortgages are unbroken as to him, he can yet assert no claim under them, nor could the trust company, by being substituted to his rights. * * * But there is no allegation in the bill that shows that the notes held by the complainant could not be collected by the ordinary proceeding at law; * * * that defendants have not sufficient property subject to levy and sale on execu-

tion to satisfy their claim; that a plain and adequate remedy cannot be had at law." The demurrer to the bill was sustained apparently upon the grounds above indicated.

The decision does not aid the claimants in this case except so far as it recognizes the distinction insisted upon by the counsel in the Ohio case; but that distinction, as well as the final decision, is based upon facts which do not exist in the present case. In this case the mortgage to the surety endorser is expressly conditioned for the payment of the notes in question, as well as to save him harmless as endorser; and it was necessarily conceded that he could commence proceedings to enforce his mortgage as soon as the notes became due and he was charged as endorser—without payment of the notes, or judgment against him as endorser. Gilbert v. Wiman, 1 Comst. [1 N. Y.] 550, and cases cited.

The case in 7 Conn. depended mainly upon the construction of the terms of an express trust, and though it assumes that when the security given to a surety was intended to be personal to him, and was given for his protection and indemnity, the creditors' rights are not the same as when the security is given for the better protection or payment of the debt, it is not regarded as affecting the present case; because the security held by the surety in this case was given for the better protection or payment of the debt as much as in the several New York cases which have been cited, and that there is in this case no more reason for saying that the security was personal to the surety and intended for his personal indemnity only than there was in the cases referred to. And in respect to a large portion of them not so much, because in this case the mortgage is conditioned for the payment of the endorsed notes as well as for the indemnity of the endorser, while in many of the cases cited the condition was for indemnity merely.

The question in regard to the equitable rights of creditors to counter securities held by a surety under the circumstances of the present case will be considered as sufficiently discussed, and the question whether these creditors have a right to prove their whole debts in these proceedings without releasing the security which they had, in equity at least, under the mortgage or under the pledge made by the bankrupts to the surety or accommodation endorser, will next be considered.

Assuming that it sufficiently appears that these creditors had, in equity and potentially, the lien and security afforded by such mortgage and pledge, because upon proper proceedings in a court of equity they could obtain the actual possession and control, and full benefit of such security, it would seem to be necessary, under the provisions of the twentieth section of the bankrupt act, that the creditors should release their claims under such mortgage and pledge, so as to relieve the estate of the bankrupts therefrom, before they could legally prove for the whole amount of their debts. The provisions alluded to are as follows, viz.: "When a creditor has a mortgage or pledge of real or personal property of the bankrupt, or a lien thereon for securing the payment of a debt owing to him from the bankrupt, he shall be admitted as a creditor only for the balance of the debt after deducting the value of such property, to be ascertained by agreement between him and the assignee, or by a sale thereof, to be made in such manner as the court shall direct, or the creditor may release or convey his claim to the assignee upon such property, and be admitted to prove his whole debt. If the value of the property exceeds the sum for which it is so held as security, the assignee may release to the creditor the bankrupt's right of redemption therein on receiving such excess; or he may sell the property subject to the claim of the creditor thereon; and in either case the assignee and creditor respectively, shall execute all deeds and writings necessary or proper to consummate the transaction. If the property is not so sold and released, and delivered up, the creditor shall not be allowed to prove any part of his debt."

It must be conceded that the creditors have not now and have not had, the present legal title to any such mortgage, security or lien, as this provision contemplates, but considering the object of this provision, the general principles and purposes of the bankrupt act and the doctrine of the equity courts, "that equality among creditors is equity," which is sought to be carried out by that act, it would seem that it should make no difference in a court of bankruptcy, which is but an offshoot of the court of chancery, that the right of the creditor is not a legal but an equitable right, and that his remedy to enforce the security must therefore be sought in a court of equitable jurisdiction. So far as the security of the creditors in this case, or the effect upon the interests of the general or unsecured creditors of the bankrupts is concerned, the case is not different from what it would have been if the mortgage and pledge had been made directly to them for their security; nor is it perceived that the equity or real substance of the case is in any material respect different from what it would have been if the mortgage or pledge had been given to a trustee under an express trust for the payment of their debts, or even directly to the creditors for their security. Can the interposition between the creditors and the debtor of a trustee or surety, possibly a man of straw, enable debtors and creditors wholly to avoid this provision of the statute? Does it make any difference that the trust is created and defined by law instead of being written out by the parties? I think not.

It was conceded on the argument that the existence of security, by reason of a convey-

ance of the bankrupt's property, with an express trust for the application of it in discharge of the creditor's debt, would, perhaps, bring the case within the provisions of section twenty; and such, it is supposed, was the decision of the learned judge of the Eastern district of Missouri, in Re Ruehle [Case No. 12,113]. See, also, In re Davis [Id. 3,-618]. In the case of an express trust the creditor can only enforce his right in a court of equity, and the creditors in this case could have enforced their rights under the mortgage and pledge to the surety, with as much certainty and with the same facility that they could have enforced their rights if the property mortgaged and pledged had been conveyed and assigned to the surety under an express trust to apply the proceeds, so far as might be necessary, in the payment of their debts. The case, as it originally stood, was, it is believed, within the provisions of the section of the bankrupt act before referred to. The general purpose and policy of that act is to produce equality among the creditors of insolvent debtors, with the exceptions provided for in the act; and to attain that end its provisions should, in cases of extreme doubt, be construed beneficially for the general unsecured creditors. The case of a creditor whose debt is, in equity, secured by a conveyance of the property of the bankrupt to a trustee or surety, is within the mischief intended to be prevented by the provision referred to, and it is believed a fair and just construction of its language embraces that case as well as a case where the security is given directly to the creditor.

A very hasty examination of English and Massachusetts cases, after the question was argued in September last, made me doubt the propriety of deciding it upon my own convictions of the proper construction and effect of the twentieth section of the bankrupt act; but the doubt has been removed by the further consideration of those cases, and the examination of other and later decisions. Though a full discussion of the cases cited by counsel is impracticable, some considerations in respect to the earlier cases, and the decisions in some later cases will be stated.

The cases, then, cited from 9, 11, and 12 Gray's Reports, are not so reported as to show that the question now under discussion was therein carefully considered. The case of Eastman v. Foster, 8 Metc. [Mass.] 19, decided some years afterwards, appears to have been fully argued, and the citation of authorities made by the respective counsel, shows that the case received an elaborate examination. Chief Justice Shaw delivered the judgment of the court, and in a very elaborate opinion declared in substance that "a mortgage deed given by the principal maker of a promissory note to his surety on the note, conditioned that the principal will pay the note and save the surety harmless, creates a trust and an equitable lien for the holder of the note; and the surety holds the mortgaged property subject to such trust and lien, even after the holder's claim on him to pay the note is barred by the statute of limitations, and though the property as between mortgagor and mortgagee may have become absolute by foreclosure; and that where a surety on several notes takes a mortgage from the principal promissor, conditioned to pay the notes and save the surety harmless, and thereby holds the mortgaged property in trust for the holders of the notes, and he remains liable on only one of the notes, and the property of the principal is assigned under the insolvent law of 1838, c. 163, the mortgaged property, if sufficient to pay all the notes, is to be applied to the payment thereof, and the surplus, if any, is to be distributed among the general creditors of the mortgagor. But if the mortgaged property is insufficient to pay all the notes, the surety is first to be indemnified therefrom, and the surplus is to be paid to the holders of the notes pro rata." The mortgage in the case was conditioned to pay the notes, and to save the surety harmless—substantially the same as the condition of the mortgage in the present case—and the case may be considered as fully recognizing and establishing, in Massachusetts, the doctrines in respect to the rights of creditors to counter securities in the hands of a surety, to the same extent that they have been established and recognized in this state; and as thereby furnishing a sufficient reason for holding that a creditor whose debt was thus secured through a mortgage of the debtor, given to a surety liable for the same debt, could not prove for his whole debt without relinquishing his security by the mortgage.

The still later case of New Bedford Inst. for Savings v. Fairhaven Bank, 9 Allen, 175, not only affirms the general doctrine of the New York cases, as was done in Eastman v. Foster, but it goes further and declares that the counter securities held by a surety for his indemnity, without any mention of the payment of the debt, are held in trust for the creditor. the court saying: "It is well settled by the authorities that the creditor has an equitable claim to the security, as well when the mortgage is given for mere indemnity as when the condition is added that the principal shall pay the debt."

These doctrines being fully recognized in these two late cases in Massachusetts, the question of the right of the creditor to prove his claim without releasing his security must thereafter stand upon the same footing in Massachusetts and in this state; and in the case last cited this question was substantially decided. The case in many and indeed in most of its features was like that now under consideration. The creditors whose debts were in equity secured by the mortgage given to the surety for his indemnity had severally proved their debts as unsecured debts, in ignorance of their rights to the security held by the surety, and had voted for and controlled

the election of the assignee in insolvency. It was after this that the creditors thus secured, by their petition, applied for an order that the premises mortgaged to the surety might be sold and the proceeds applied towards the payment of their debts, and that they might then prove against the estates of the insolvent debtors (principal and surety) any balance which might remain. In this state of the case, the judge who delivered the opinion of the court, after referring to the mortgage given to the surety, said: "It was not taken for the general benefit of all his creditors, and its object was to indemnify his estate from the payment of the particular debt. Primarily, therefore, it would seem to be the proper course to apply the security to the payment of that debt, and thus leave the other creditors of the endorser in the same condition as if the endorsement had not been made. The proper course, then, would seem to be, that the creditor should first petition, as he has done, to have this security applied towards the payment of his debt and then make proof of the balance. But it is objected, on the part of the plaintiffs, that the defendants have forfeited their right to have this application made for their especial benefit, because they first proved their debts and then made use of their position as creditors to vote for the discharge of the debtor, and that they have thereby affected the rights of the plaintiffs injuriously. As the claim of the defendants consists of a mere equitable lien, they contend that it ought to be discharged by any conduct of the defendants which thus injuriously affects the plaintiffs. The court are of opinion that this view of the matter is sound and equitable. The defendants had a right to waive their equitable claim to the mortgages; for the mortgages were not made to them, and they had never assented to them. The other creditors could not, therefore, object to the proof of their debts. Upon the proof being made, the amount of their claims enabled them to control the choice of an assignee, as well as the discharge of the debtor. It is the latter fact only which is made the subject of complaint in the plaintiffs' bill, and, therefore, the effect of the proof upon the choice of the assignee is not to be considered in this case though it was alluded to in the argument. But the fact that the defendants thus acquired the power to control the vote of creditors on the question of the debtor's discharge, and actually exercised that power, and procured the discharge, must be considered as a material interference with the rights of the other creditors. The discharge is doubtless valid, because the defendants had rightfully proved their debts, and had a right to vote on the question. After they have done this, on the ground that they had no lien upon the mortgages, it is not equitable to permit them to insist upon the lien, and thus obtain a preference over the other creditors. The equitable considerations which favor the equal distribution of assets among creditors ought not to be set aside in such a case. On the contrary, we think, the defendants should be bound by the position which they have taken. But the defendants contend that the acts referred to were done by them in ignorance of the fact that they had a lien. It would be difficult to maintain the position that they had not, at least, constructive notice of the existence of the mortgages, because the mortgages must have been recorded in order to be made available to them; and the fact that they had not actual knowledge of the existence of the mortgages, or that they did not know what were their legal rights under them, is not material. But whatever their ignorance may have been, if they have ignorantly proceeded in such a manner as to affect the rights of the other parties, the injurious consequences of their acts ought to fall upon themselves, and not be thrown upon others." This is the latest decision in the Massachusetts courts bearing upon this question, which has been brought to my notice; and it seems to sustain the view I was inclined to take when the question now under discussion was first brought before me, and to dispose of the earlier cases which seemed to sanction the opposite view.

The English decisions cited as bearing upon this question are too numerous to be discussed in detail, and it is quite certain that several of them should have no influence upon the decision of the question now under discussion. In others the decision mainly depended upon facts and circumstances essentially different from those of the present case, and in still others, upon technical rules established by the English courts in regard to proofs of joint or separate claims, as against joint or separate estates, when parties owing joint and copartnership debts are in bankruptcy under a joint commission. Under these the English courts seem, in many cases, to have disregarded substantial equities and to have applied in their utmost rigor certain general rules of an extremely technical character; quite as much so as any that find favor in our common law courts. Thus, as a general rule, joint creditors cannot take a dividend from the separate estate of one or two or more bankrupt partners until the creditors of the single partner only are fully paid out of the separate estate of such individual debtor; and the separate creditors of the single partner cannot take a dividend from the joint estate until the joint creditors are fully paid; except that when there is no joint estate and no solvent partner, (and any partner is regarded as solvent who is not bankrupt) the joint creditors may prove and take dividends from the separate estates of the partners. This is carried so far that when there is any joint fund, however small, to resort to, the joint creditors cannot prove in competition with the separate creditors (Ex parte Janson, 3 Madd. 229), and my recollection is that this doctrine has been pressed so far that when the joint fund was produced by the separate creditors bidding

off, for a small sum, entirely worthless demands due the copartnership, for the sole and almost fraudulent purpose of creating a joint fund, the right of joint creditors to take a dividend from the separate estates of the bankrupts was denied. In fact some of these technical rules have been disapproved by the ablest of the lord chancellors of England, though they declined to overthrow what had been established by their predecessors. I think I should hesitate long before avoiding the provisions of the bankrupt act by the adoption of other and further rules as technical as these, and even the English courts are inclined to engraft exceptions upon such technical rules, and to hold that parties who have done what can be considered a waiver of their strict rights, under a misapprehension or in ignorance of the law, shall not be allowed to avoid the effect of such waiver when it tended to produce equality among creditors. Ex parte Davenport, 1 Mont. D. & D. 313.

The examination I have been able to give to the English cases has satisfied me that the equitable doctrines, the existence of which was recognized, perhaps, for the first time by the lord chancellor of England, in Maure v. Harrison, in 1692, have had their most vigorous growth and fullest and most frequent recognition on this side of the Atlantic. If they have ever been strongly insisted upon in the English bankruptcy courts they do not appear to have been elaborately discussed or carefully considered by those courts; though it would seem that in some of the cases they have been either denied or ignored. Some of the later cases are certainly more favorable to the opposing creditors in this case, but only a very few of the English cases which have been cited will be considered.

The first is the case of Ex parte Hope, 3 Mont. D. & D. 720, decided in 1844, and in which it was here insisted by the counsel for the claimants in this case that the very question now before the court was decided. The debt due the creditor was in all seventeen thousand five hundred and sixty-eight pounds. The sureties had given a continuing guaranty for ten thousand pounds, with a special proviso that if the debtors should become bankrupt, all sums received out of the debtor's estate should be applied to pay any excess of the debt over ten thousand pounds. The sureties had a counter security by mortgage and a pledge of stocks (both being of the property of one of the three debtors and not "of the debtors," as stated in the counsel's brief,) and out of these mainly, but with a very small addition from their own money, the sureties paid the ten thousand pounds on their guaranty. The creditors had proved their whole debt of seventeen thousand five hundred and sixty-eight pounds, and had received dividends thereon. The assignee moved to reduce the proof to seven thousand five hundred and sixty-eight pounds. The creditor having received a dividend of two shillings and three pence in the pound on the whole debt, the assignee also moved that the dividend on ten thousand pounds should be paid to him for the benefit of the estate. The court decided that the creditors had rightfully proved their whole debt and were entitled to retain the dividend. The case is not at all like the one now before this court. The security was upon the separate property of one of the bankrupts. The debt and proof was against the bankrupts jointly, affecting their joint estate only, and under the well settled English rule the security by mortgage or pledge of separate property of one of the debtors, even if given directly to the creditor and held by him, not as an equitable but as a strict legal right, would not have prevented the making of proof against the bankrupts jointly, or the taking of a dividend from their joint estate. No proof was made against the separate estate of the partner whose separate property was bound to the surety. The fact that the lien was upon the separate property of one of the bankrupt debtors from whose joint estate alone the dividends were paid was referred to by the judge, in his opinion, as follows: "The debtor was, in truth, a firm of several persons in partnership together, and the mortgaged estate seems to have been the property of one of the firm, a circumstance which appears to me to make no difference, at least in favor of the petitioners. I suppose if it had been made originally to the respondents (the creditors) it would not have affected their right of proof against the firm." The judge also stated as a reason for his decision that the assignees could make no claim against the creditors' dividends; that they could make no claim which the surety could not have made; that he could not have made such claim; and the petition was dismissed. The surety had waived all benefit to a dividend by the very terms of his agreement, and in that case, as in the case of Midland Banking Co. v. Chambers, L. R. 7 Eq. 179, and 4 Ch. App. 398, the surety was, in fact, a surety only for a limited amount of the balance, if any, which might remain after the estate of the bankrupt had been exhausted. The surety not being ultimately or equitably liable in either case for the whole debt proved, but only for the balance, if any, which might remain due after the creditor had exhausted his remedy against the bankrupt's estate, could not claim a return of any dividends paid from that estate until the creditor had received more than twenty shillings in the pound from such surety and the estate.

The earlier case of Ex parte Sherrington, 1 Mont. D. & D. 195, decided in 1840, is, I think, very far from being an authority for the claimants. The surety or guarantor had taken from the bankrupt a deposit of a lease by way of equitable mortgage, for his indemnity against his guaranty for advances

by the creditors, his liability being limited to the amount of seven hundred and fifty pounds. The creditors' whole debt exceeded one thousand four hundred pounds, for which sum they proved their debt in the bankruptcy proceedings against the principal debtor. The surety presented his petition praying that the leasehold premises might be sold and the proceeds applied in payment of what was due from the bankrupt and his surety, or in case the surety should have paid the sum for which he was liable, or any part of it, then in payment of what should be due to the surety. The sale was ordered, with liberty to the creditors to apply to the court for the proceeds, upon their undertaking to expunge so much of their debt proved as the net proceeds received by them should amount to. The case is, in fact, more favorable to the assignee in this case than to the claimants, as it shows that the right of the creditors to the security held by the surety was so far recognized as to allow him to apply for its proceeds, while it, at the same time, recognized the doctrine that the exercise of the right to receive such proceeds would necessarily preclude the creditors from taking a dividend upon any part of their debt except the balance left after the application of the proceeds of the security.

In Ex parte Perfect, 1 Mont. 25, decided in 1830, Neville accepted the bills of Bowes, it being agreed that the acceptor should hold yarn belonging to Bowes, and which was in Neville's hands to be bleached, as security against the bills. Both Bowes and Neville became bankrupts, and the yarns were possessed by the assignees of Neville. The holders of the bills presented a petition praying that the yarns might be sold and the proceeds applied in payment of the bills, and that they might prove for the deficiency, if any, against the estates of Bowes and of Neville. The assignees of Bowes resisted the application and insisted that the creditors having taken the bills without any notice of any agreement between Bowes and Neville about the yarns being held as security, could not have the benefit of the agreement. The vice-chancellor made the order as prayed, deciding that the acceptor was to be indemnified by applying the proceeds of the security in payment of the bills as far as they would go, and that the holders were entitled to prove against both estates for the deficiency, if any.

The case in 3 Mont. & A. 269, decided in 1837, is very much to the same effect. The holders of bills who had already proved their debts for the full amount, were declared entitled to the proceeds of goods held by the acceptor as his security, and to prove for the balance remaining due, although it was declared that the proof must be expunged pro tanto; of course dividends on the balance only were allowed to the holders of the bills.

Taking all of the English cases together they certainly do not sustain the position taken by the counsel for the claimants and the later cases are considered very favorable to the claims of the assignee and unsecured creditors.

It may be useful to refer to a case supposed by the learned counsel for the claimants as illustrating the alleged difficulties of the construction against which he is contending. He puts this case: "A is the maker, B the accommodation endorser, and C the holder of a note; B having a mortgage on A's estate for his protection. Both A and B go into bankruptcy, having, each of them, other and unsecured creditors. Have the creditors of A, or those of B, (if either) the right to exclude C, the holder of the note, from proving his debt unless he gives up his security? Must he surrender his security to the assignee of A, or to the assignee of B?" If he prove against A, he must certainly surrender all right to his security as against the property of A, and by doing it he would discharge the surety from his liability, at least to the extent of the value of the security released, and could, therefore, prove against A's estate for the whole amount, and against B's estate for the balance left due only. If he prove against B alone he would probably release the security, so far as B was concerned, to B's assignee; but B's assignee would not be allowed to use the security except so far as it became necessary to reimburse B's estate the amount of dividends paid from it to the holder of the note. These are probably the rules applicable to such cases, but it will be time enough to consider them with care when they are necessarily in judgment; a condition of things not likely to arise in the present case. Nor is there any difficulty in the case, under the provisions of the bankrupt act, in respect to the release, conveyance or sale of the property mortgaged as security. It may be sold under the direction of the court, given after notice to persons in interest, and certainly the assignee and creditor could not, by fraudulently or even improperly agreeing upon an insufficient valuation of the property and a conveyance or release of it to the creditor without the surety's consent, conclude or defeat the rights of the surety. Indeed, the two English cases last cited indicate very clearly the proper course to be pursued in the case supposed.

On the whole, then, it must be held that the claimants in this case, before they proved their debts, "had" such a lien or security as prevented them from proving their debts for the whole amount as unsecured debts without releasing their equitable interest in the mortgage and pledge before referred to.

The conclusion just stated does not dispose of the case, for other questions, those of the effect of the proof of these debts as unsecured debts, the voting thereon as such and thereby controlling the choice of the assignee, and of the effect of the release referred to in the case, remain to be considered. It is not doubted that the claimants in this case

might release and surrender all mortgages, liens and pledges, for the security of their debts which they "had" before making proof of their debts, and then prove their debts as wholly unsecured. This might be done by a direct and formal release, or by such acts as, either at law or in equity, are equivalent to such express release. As the beneficiaries of the trust created or implied for their sole benefit, they could, like any other sole beneficiary in a simple unrestricted trust to convert property into money and pay over the proceeds to the beneficiary, release and discharge the trust, the trustee and the trust property, without the aid or intervention of a trustee having no interest in the continuance of the trust, and as such release and discharge without the consent of the surety must also release and discharge such surety, at least, to the extent of the full value of the trust property released, the surety trustee has no interest in opposition to the release. And it is supposed that the surety to the making of such release would not prevent the release and discharge of the trust property as between such surety and the general creditors of the bankrupt.

It appears to be well settled in England and in this country that a creditor having a mortgage or other lien upon the property of the bankrupt, who proves his whole debt as unsecured, without disclosing the security, thereby waives and relinquishes his lien. Ex parte Rolfe, 3 Mont. & A. 306; Ex parte Solomon, 1 Glyn & J. 25; Stewart v. Isador [5 Abb. Pr. (U. S.) 68]; In re Bloss [Case No. 1,562]; In re Brand [Id. 1,809]; Wallace v. Conrad, 3 N. B. R. (Quarto, 10) 41; New Bedford Inst. for Savings v. Fairhaven Bank, 9 Allen, 175.

When such proof is made by the creditor in ignorance of the security, and, perhaps, even when made under a mistake in regard to the law of the case, a creditor would be allowed to withdraw such proof, and then prove as a secured creditor, when no injury had resulted to the unsecured creditors by such improper proof; but after the taking of a dividend upon his whole debt as an unsecured creditor, to the prejudice of the general creditors, he would be held to his election. New Bedford Inst. for Savings v. Fairhaven Bank, ubi supra; Ex parte Davenport, 1 Mont. D. & D. 313. And in this case, the creditors, after what has passed and the litigation that has been had in regard to their claims, could hardly ask to withdraw their proofs, even if they had not executed the instrument of release, a copy of which is annexed to the special case.

This instrument is a full release and surrender of all the lien and claim of the creditors under the pledge and mortgage to the surety endorser, unless avoided or restricted by the declaration that the release and surrender are not to affect the right of the surety to enforce his mortgage. Whatever effect that declaration, or any understanding or agreement between the creditor and the surety may have upon their respective rights and interests, it is unnecessary now to inquire. Such a declaration cannot operate to defeat the unconditional release of such rights as these creditors had in the mortgage, and they, at least, have no longer a lien on any portion of the estate of the bankrupts for the security of part of these debts. On this ground, and on the ground that the proof of the debts as unsecured debts was, of itself, a waiver of their security on the bankrupt's property, it is held that the proofs of debt and claims of the creditor-claimants are not to be expunged.

It was stated in the argument of the claimants' counsel, and sufficiently appears in the special case, that part of the real estate mortgaged was partnership property which the bankrupts held as tenants in common, and other parts of it property which each of the bankrupts owned in severalty and held as his separate estate; and it was urged that, in respect to such separate property, if not, also, as to that held by the bankrupts as tenants in common, there would be no claim that the lien of the mortgage thereon should prevent the proof of the creditors joint debts. It would be unnecessary to consider this question now, even if no effect were to be given to the making of the proofs as of unsecured debts, or to the release: because there was confessedly some copartnership property subject to the mortgage, which would necessarily prevent the claims from being wholly unsecured. Whether the copartnership property only, or that and the property held by the bankrupts as tenants in common, would have been regarded as part of the joint estate of the bankrupts, in case the claimants had claimed to be secured creditors, is a question upon which no opinion is expressed. It is apparent that much of this opinion is occupied in the discussion of questions not necessary now to be decided, if the main or final question presented by the case submitted is properly disposed of upon the grounds now relied upon as justifying the decision; but as the questions first discussed herein have been fully argued at the bar, and must ere long again come up for discussion, it was thought best to express an opinion thereon. A decree will be made in accordance with this opinion; and, as the questions first discussed were not free from difficulty and doubt, no costs will be allowed to either party as against the other, and no decree will be entered for some days, that either party may have time to prepare to bring on an appeal.