DAVID WATTS, Survivor of HUBBARD ARNOLD, Appellant, *v.* WILLIAM D. SHIPMAN, as Assignee of WILLIAM BUTLER DUNCAN and others, Respondents.

*Trust for the payment of outstanding checks of its creator—what is sufficient to establish one—a general assignee of the creator of the trust takes subject to it.*

The firm of Duncan, Sherman & Co. had, for many years prior to July 26, 1875, been engaged in carrying on business as bankers in the city of New York. To settle claims held against them, by persons who did not keep accounts with them, they were accustomed to give to such persons what were called "cashier's checks," which checks were cashed, through the clearing-house, by the National Bank of the State of New York, in pursuance of an arrangement made between it and the said firm, by which the latter agreed to protect the bank for all payments thereof which it might make. On the morning of July 27, 1875, the said firm, having then largely overdrawn its account with the said bank, and being then largely indebted to it, delivered to the attorney for the said bank a letter, addressed to its president, stating that they had so overdrawn the account, requesting the bank to pay such overdraft, and transferring to it certain securities, which were delivered, with the letter, to the attorney, who delivered them to the said president before 10 o'clock of the morning of July 27. The securities so deposited were sufficient in value to pay all the drafts and checks which had then been drawn by the said firm in accordance with the arrangement made with the said bank, including the one upon which this action was brought. The securities were so furnished and delivered in pursuance of the arrangement by which the bank was to be protected in all payments that it might make of certified checks and cashier's checks, drawn by the said firm. On the same day, but subsequent to the delivery of the letter, the said firm made a general assignment, for the benefit of its creditors, to the defendant, Shipman.

On July 26, 1875, the said firm of Duncan, Sherman & Co., being indebted to the firm of which the plaintiff is the survivor, delivered to it a cashier's check for $6,665.63, which was on that day deposited by the said firm with the Fourth National Bank of the City of New York, and which check had, prior to the deposit of the securities with the bank, passed the clearing-house. Payment of the check having been refused by the bank, this action was brought by the plaintiff against the firm of Duncan, Sherman & Co., the general assignee, Shipman, and the National Bank of the State of New York, to enforce its payment.

*Held,* that by the transfer of the securities and the acts of the parties, a valid trust had been created for the payment of all checks and drafts which had, at the time of the deposit, been drawn by the firm of Duncan, Sherman & Co.

That the trust included and applied to such checks and drafts as had been

then drawn, but not yet presented, as well as to those which had already been presented to and paid by the bank.

That the holders of such checks and drafts acquired, in equity, such an interest in the securities so deposited as to create in their favor a preference over the creditors claiming under the general assignee.

That the plaintiff was entitled to recover.

APPEAL by the plaintiff from a judgment in favor of the defendants, entered upon a trial had at a Special Term.

This action was commenced by the firm of D. Watts & Co., as plaintiffs, against the copartnership firm of Duncan, Sherman & Co., William D. Shipman, their assignee for the benefit of creditors, and the National Bank of the State of New York, to enforce the payment of a certain "cashier's check" for $6,665.63, made by Duncan, Sherman & Co., in favor of D. Watts & Co., July 26, 1875, the day preceding their insolvency and assignment. For the payment of this check the plaintiffs claimed that Duncan, Sherman & Co. had delivered to the National Bank of the State of New York certain securities, constituting a trust fund, to meet this and certain other outstanding obligations of Duncan, Sherman & Co., to the benefit of which the plaintiffs and the holders of such other obligations were entitled, in preference to the general creditors of Duncan, Sherman & Co.

Duncan, Sherman & Co. having, during the pendency of the action, been discharged in bankruptcy, the action was discontinued as to them by order of the court.

Mr. Arnold, one of the plaintiffs, having died, the action was continued by his surviving partner.

The issue raised by the pleadings was whether the securities delivered to the National Bank of the State of New York, for the payment of the check in question and other checks, constituted a trust fund for that purpose, for the benefit of the plaintiffs, or whether by the assignment they passed to the assignee, free from any claim or equity on the part of the plaintiffs?

*William Allen Butler*, for the appellants. The transaction, as proved, constituted a specific appropriation by Duncan, Sherman & Co., of the securities transferred to the National Bank of the State of New York, as a fund for the payment of the "cashier's

check" held by plaintiffs, which will be upheld in equity for their benefit. (*Marine & Fire Ins. Bank of Georgia* v. *Jauncey*, 1 Barb., 486; 3 Sandf., 257; *Curtis* v. *Tyler*, 9 Paige, 432; *Exp. Waring*, 19 Ves., 350; *S. C.*, 2 Rose Bankr. Rep., 182; *Exp. Parr*, Buck's Cases in Bankruptcy, 191, 196; *Exp. Perfect*, Montagu Bankr. Rep., 25; *Exp. Prescott*, 3 Deacon & Chitty Bankr. Rep., 218; *Powles* v. *Hargreaves*, 3 De Gex, Macn. & G., 430; *City Bank* v. *Luckie*, L. R., 5 Ch. App., 773; *Exp. Smart*, L. R., 8 Ch. App., 220; *Exp. Gene. South Am. Co.*, L. R., 10 Ch. App., 635.) The doctrine of equity which we invoke will be found to be equally well settled in this country as in England. (*Moses* v. *Murgatroyd*, 1 Johns., 119; *Mauré* v. *Harrison*, 1 Eq. Ab., 93 k.; 5 Mich., 1692; *Bank of Auburn* v. *Throop*, 18 Johns., 505; *Vail* v. *Foster*, 4 N. Y., 312.) The assignment by Duncan, Sherman & Co., to the defendant Shipman, did not affect the equity of the plaintiffs, which attached to the securities as soon as the trust in their favor was accepted by the National Bank of the State of New York. The assignee took no greater rights than his assignors had in the assigned estate, and it came into his hands charged with all the equities existing in respect to it at the time of the assignment. (*Mitchell* v. *Winslow*, 2 Story, 630; *Reed* v. *Sands*, 37 Barb., 185; *Slade* v. *Van Vechten*, 11 Paige, 21.)

*Benjamin D. Silliman*, for the respondent. The securities which were placed, on July 27, with the Bank of the State of New York, passed under the assignment to Judge Shipman, their assignee. (*Beckwith* v. *Union Bank*, 9 N. Y., 211; *Lunt* v. *Bank of N. America*, 49 Barb., 221; *Dykers* v. *Leather, &c. Bank*, 11 Paige, 612.) Inasmuch as a check is not an assignment of funds of a depositor in a bank, and a bank owes no obligation to the holder of the check until it has accepted it, it follows that the check was no assignment of or lien on any security of Duncan, Sherman & Co. in the hands of the bank. (*Copperthwaite* v. *Sheffield*, 3 N. Y., 243; *Winter* v. *Drury*, 5 Id., 525; *Chapman* v. *White*, 6 Id., 412; *Warner* v. *White*, 5 Nat. Bankr. R., 416; *Exp. Rowton*, 17 Ves., 426; *Exp. Trelers*, 18 Id., 229.)

INGALLS, J.:

On July 26, 1875, Duncan, Sherman & Co., being indebted to the plaintiff, made and delivered the following check:

·"No. 50,001.                        NEW YORK, July 26, 1875.

"DUNCAN, SHERMAN & Co., pay to Messrs. D. WATTS & Co., or order, in current funds, sixty-six hundred sixty-five 63-100 dollars. "$6,665 63-100.            DUNCAN, SHERMAN & CO." ·

[Across the face.]    "Sixty-six hundred sixty-five 63-100.
    "Entered, J. B. B.                    ·Cashier's Check."

[At the end.]        "DUNCAN, SHERMAN & CO.,
                    "J. C. HULL, *Cashier.*" · ·

This is known as a banker's check, and is evidence of an existing indebtedness from Duncan, Sherman & Co., to the plaintiff. It seems to have been one of a series drawn by the said firm for convenience in transacting their business, and by an arrangement with the National Bank of the State of New York, such checks were to be cashed by the said bank through the clearing-house. In regard to the check in question William G. Sewell testified at the trial:

"In July, 1875, I was in the employ of Watts & Co.; I recollect this check ['Ex. A.'] distinctly; on the 26th of July, 1875, I deposited it in the Fourth National Bank.

"Q. By looking in this book now shown you, which is the bank-book of Watts & Co. with that bank, the entry on that day, the 26th, is what?

"A. I find here an amount which includes that check: I find here deposited on that day $7,193, 28, and a portion of that deposit was made up of this check; I identify that as the pass-book, and the entry of the deposit was made by Mr. Watts, I believe the receiving teller of the Fourth National Bank at the time I made that deposit; I made that deposit, I should judge, between 2 and 3 o'clock; I got the check from Duncan, Sherman & Co.; I don't remember the man who delivered it to me; I remember collecting the check; I went there and collected it in the regular course of business."

Mr. Duncan, as a witness upon the trial, described the manner the checks were negotiated, as follows :

"Q. State to the court generally in what transaction these cashier's checks were used ?

"A. When parties had claims on us requiring the payment of money, and didn't have an account with us which permitted their drawing their check upon us, we were in the habit of paying them by the checks of the firm, countersigned by the cashier, and called the cashier's checks, and this check is one of that general description ; we were in the habit of drawing these checks daily and constantly for large amounts, according to the course and practice of business in our banking house ; these checks were not paid over our own counter ; our firm had an arrangement with another banking house or corporation to cash these so-called cashier's checks drawn by our firm ; we had such an arrangement with the National Bank of the State of New York."

The court has found the following :

"*Fifth.*—That on the morning of the said 27th day of July, 1875, the firm of Duncan, Sherman & Co., having largely overdrawn any amount which they had in the Bank of the State of New York, and being then largely indebted to said bank, delivered to Samuel L. M. Barlow, Esq., who assumed to act in that respect as the attorney of the said Bank of the State of New York, a letter, which is in the words and figures following, that is to say :

"                                     '24th July, 1875.

"'THE PRESIDENT,

         NATIONAL BANK STATE OF NEW YORK,

"'*Dear Sir :*—We may have overdrawn on you to the amount of say $180,000 ; we request you to pay said overdraft, and we hereby transfer to you securities, as per inclosed list ; also the margin on loan of $300,000 borrowed from the Farmers' Loan and Trust Company, on May 1, 1875, due November 4, 1875, secured by 3,500 shares Panama R. R. stock, subject to their lien of $300,000, and interest, and we have duly notified this assignment to the Farmers' Loan and Trust Company.

"'                      Yours truly,

"'(Signed)       DUNCAN, SHERMAN & CO.'

" And at the same time delivered to him the securities therein mentioned, all of which he delivered to Mr. Duer, the president of said bank, by or before 10 o'clock of the morning of said 27th July, 1875; which securities were so furnished and delivered in accordance with a general arrangement which had existed between said firm and said Bank of the State of New York; that said bank should be protected in payments which it might make of certified checks and cashier's checks, drawn by said firm."

Mr. Barlow testified in regard to the letter and the securities:

" A.  This letter bears date 24th of July, 1875, but it was not delivered until the morning of the 27th; the first lines contain the substance of the contract; Mr. Duer said, on looking at the securities, they were ample to cover the amount, and he afterwards told me the same thing.

" Copy letter put in evidence by defendant's counsel, marked 'Ex. 2.'

"*Plaintiff's Counsel:*—Do you know the fact that the Bank of the State of New York did go on and pay the bulk of those certified checks and cashier's checks?

" A.  I know it inferentially; I don't know it positively.

" Q.  Wasn't that fact brought to your knowledge when you took away those securities, that they had already paid the bulk of those certified checks, and cashier's checks?

" A.  I believe that they were nearly all paid.

" Q.  Wasn't the fact stated to you by Mr. Duer when you came to take away the securities?

" A.  I don't know where I got the information; I think the fact is so, and yet I don't know where I got the information."

On the same day, but subsequent to the delivery of such letter and securities to the bank, Duncan, Sherman & Co. made a voluntary assignment, for the benefit of their creditors, to the Hon. William D. Shipman, who claims the securities under such assignment.  The securities deposited with the bank were sufficient in value to pay all the drafts and checks drawn by Duncan, Sherman & Co. in accordance with such arrangement with the bank, including the check in question.  Mr. Duncan testified:

" Q.  State whether or not on July 26, 1875, you had on deposit

with the Bank of the State of New York securities to protect that bank for the payment of these cashier's checks of which you have spoken?

" A. I can't state whether, on the 26th, we had; we had on the 26th or the 27th; I can't state about the 26th, because I am not certain as to the date; it is some time ago; it was either the 26th or 27th; at, and shortly prior to our suspension, our house had funds and securities lodged with the Bank of the State of New York; the amount of the funds and securities so lodged was in excess of the amount of the outstanding cashier's checks, on the morning of July 27.

"*By Counsel for the National Bank of the State of New York:* Q. These securities were deposited, you say, to meet over drafts represented by these checks; were they deposited to meet overdrafts alone and these checks, or were they deposited to meet any other of your liabilities?

" A. All of our liabilities to the bank, which only arose, however, *from just such transactions and from certification of checks.*"

We think the evidence is fairly to the effect, that the securities were deposited with the bank for the purpose of securing the payment of the class of obligations of which the check in question was one; and that such deposit was made in accordance with the arrangement between the bank and Duncan, Sherman & Co., in regard to the payment of such drafts and checks. No other inference can, in our judgment, be fairly drawn from the facts, in regard to the intention and purpose for which such securities were delivered and accepted. The check in question had been drawn, and delivered to the plaintiff, and deposited in the Fourth National Bank, and passed the clearing-house previous to the depositing of the securities by Duncan, Sherman & Co. Although the letter, which accompanied the securities, bears date July 24, 1875, it was not delivered until the morning of the 27th of the same month. And the evidence fully justifies the assumption that it was intended to take effect at the time of its delivery, and to include all the outstanding drafts and checks, of the description above mentioned. There seems to be nothing which indicates that a distinction was

intended, at the time of such deposit, to be made between such as had been paid by the bank and those which had been drawn but not presented, and we perceive no reason for any such unjust discrimination. Duncan, Sherman & Co. evinced no desire to withdraw the securities, or to revoke the deposit, or to limit its effect to a portion of that class of obligations. Mr. Duncan testified at the trial:

"A. The deposit of the securities was necessary to meet the outstanding checks, and whether that was on Tuesday morning, or not, I can't recollect. There was a deposit of securities for this purpose at that time made specifically, specifically for the purpose of meeting the over drafts of the account represented by these outstanding checks, *of which this check was one;* I don't think I personally went to the bank in connection with that deposit; I recollect the fact of its being made; I did not, of course, at any time after that deposit was made for the purpose I have mentioned, withdraw it or do any act of withdrawal, unless the assignment to Judge Shipman operated legally to affect it; I never did any act about it."

The conduct of the assignee is very commendable in not interposing captious opposition to a just and legal adjustment of this controversy. The learned judge at Special Term seems to have regarded this case as within the doctrine of a class of decisions which declare that a check or bill of exchange, before acceptance, gives to the holder no lien, legal or equitable, upon funds of the drawer in the hands of the drawee, of which *Winter* v. *Drury* (5 N. Y., 525) is an example. If the facts of this case established no more than the mere drawing of a check upon a bank in the ordinary way of transacting business of that description, an acceptance would be required before a fund in the hands of the drawee would be bound. We are satisfied that this case contains elements which clearly distinguish it from the class of cases referred to, and upon the authority of which this cause seems to have been decided at Special Term. In our judgment, the facts develop all the essential elements of a valid trust created for the payment of such drafts and checks. Duncan, Sherman & Co. being, at the time, the owners of the securities, and possessing the right to devote them to any lawful purpose, voluntarily placed

them in charge of the bank for a declared purpose, and in regard to which we think no reasonable doubt can be entertained; when the contents of the letter, the verbal directions, and the general circumstances which surround the entire transaction are fairly considered, there remained no uncertainty in regard to the class of persons who were to be benefited by such deposit, as the nature of the obligations intended to be provided for was understood, and sufficiently defined. The securities were not received by the bank, in the ordinary way of accepting deposits, or even collaterals, simply to protect the bank, or to create a fund to be checked out by the depositors. Duncan, Sherman & Co. doubtless intended by depositing the securities, to protect the bank against loss; yet, we think their primary and main purpose was to provide means by which the holders of such checks would be paid in full. The reason for preferring that class of creditors is immaterial, so long as they had a perfect right to devote the securities to such object. The depositing of the securities can properly be regarded as part of a scheme, somewhat extraordinary perhaps, adopted by Duncan, Sherman & Co. in transacting their financial business. The check was received by the plaintiff upon the assumption that it would be paid by the National Bank of the State of New York, pursuant to the arrangement between Duncan, Sherman & Co. with such bank. We conclude that, by the established facts of this case, the three parties, Duncan, Sherman & Co., the bank, and the plaintiff are drawn into such relation, that the latter acquired in equity such an interest in the securities deposited with the bank, as created in his favor a preference over the creditors claiming under the assignment. In Story's Equity Jurisprudence (vol. 2, § 964), the author, in defining a trust, remarks: "Three things are said to be indispensable to create a valid trust. First, sufficient words to raise it; secondly, a definite subject; and, thirdly, a certain or ascertained object." In *Martin* v. *Funck* (75 N. Y., 134), Judge CHURCH remarks at page 141: "No particular form of words is necessary to constitute a trust, while the *act or words* relied upon must be unequivocal, *implying* that the person holds the property as trustee for another." The same case declares that the validity of a trust does not depend upon the party to be benefited thereby having notice

of its creation at the time. In Kent's Commentaries (vol. 4, p. 306), the author says, " If a trust be created for the benefit of a third person, without his knowledge, he may, when he has notice of it, affirm the trust, and call upon the court to enforce the performance of it. Collateral securities given by a debtor to his surety are considered as trusts for the better securing of the creditor's debts, and Chancery will see that their intention will be fulfilled." (*Rogers Locomotive Works* v. *Kelly*, 19 Hun, 399 ; *Exp. Waring*, 19 Vesey, 345 ; *Curtis* v. *Tyler*, 9 Paige Ch., 432 ; *Moses* v. *Murgatroyd*, 1 Johns. Ch., 119.) Applying these legal principles to the facts of this case, we are satisfied that a valid trust was created, which inured to the benefit of the plaintiff, and which should be executed in his favor. When the securities were placed in the possession of the bank by Duncan, Sherman & Co., they were beyond recall, as the trust attached, which could only be discharged by the consent of the parties for whose benefit it was created, by the holders of the drafts and checks. We fail to discover any reason founded in equity, upon public policy, or commercial security, which should induce the court to deny to the plaintiff the protection which the justice of his case demands. The judgment should be reversed, and a new trial ordered, with costs to abide the event.

DAVIS, P. J., and BARRETT, J., concurred.

Judgment reversed, new trial ordered ; costs to abide event.